OPINION *Page 2 
{¶ 1} Defendant-appellant, Wayne Allsup (hereinafter "Allsup"), appeals the judgment of the Hardin County Court of Common Pleas. For the reasons that follow, we affirm.
 {¶ 2} On September 1, 2006, the Hardin County Grand Jury indicted Allsup on eight counts, including: count one of aggravated menacing, in violation of R.C. 2903.21(A), (B), a fifth degree felony; count two of obstructing official business, in violation of R.C. 2921.31(A),(B), a fifth degree felony; count three of telecommunications harassment, in violation of R.C. 2917.21(B), a misdemeanor of the first degree; count four of possession of criminal tools, in violation of R.C. 2923.24(A), a misdemeanor of the first degree; count five of telecommunications harassment, in violation of R.C. 2917.21(B), (C)(2), a fifth degree felony; count six of possession of criminal tools, in violation of R.C.2923.24(A), a fifth degree felony; count seven of telecommunications harassment, in violation of R.C. 2917.21(B),(C)(2), a fifth degree felony; and count eight of possession of criminal tools, in violation of R.C. 2923.24(A), a fifth degree felony.
 {¶ 3} The prosecution subsequently filed a motion to dismiss counts seven and eight of the indictment and to amend count one of the indictment to *Page 3 
aggravated menacing, a first degree misdemeanor. The trial court granted the motion.
 {¶ 4} A jury trial was held on April 10, 2007. Allsup made a motion to dismiss the charges pursuant to Crim.R. 29. (T. 4/10/07, 126). The trial court dismissed counts five and six of the indictment, but overruled the motion as to counts one, two, three, and four. (Id. at 135-136). Allsup subsequently renewed his Crim.R. 29 motion. (Id. at 174). The trial court overruled the motion. The jury found Allsup guilty of counts one, two, and three, but the jury found Allsup not guilty of count four.
 {¶ 5} The trial court sentenced Allsup in count one to a jail term of 90 days with credit for fifty one days served, with the balance of the sentence suspended; ordered the jail term be served consecutively to count two; and placed Allsup on three years of community control pursuant to the sanctions imposed in count two. On count two, the trial court placed Allsup on three years of community control with intensive supervision and several special conditions. On count three, the trial court sentenced Allsup to ten days in jail, with credit for ten days served and ordered that it be served concurrently with count one.
 {¶ 6} It is from this judgment that Allsup appeals and sets forth four assignments of error for our review. *Page 4 
 ASSIGNMENT OF ERROR NO. I The trial court erred in overruling the Defendant's Crim.R. 29 Motion with respect to the Obstructing Official Business charge.
 {¶ 7} In his first assignment of error, Allsup argues that the state presented insufficient evidence to prove that he did any act to impede the officers from serving the warrant they were attempting to serve, and thus, the trial court should have granted the Crim.R. 29 motion. Allsup further argues that he had the right to demand that the police obtain a search warrant before entering his house, and this could not constitute obstruction of justice. In addition, Allsup argues that his failure to open the door once the warrant was obtained was insufficient to constitute obstructing official business. Allsup argues that if the act underlying the charge was not those acts but some other act, that the evidence was still insufficient as there was no testimony that Allsup hampered or impeded the officers in the performance of their duty. Finally, Allsup argues that there was no testimony that any of his acts created a risk of harm.
 {¶ 8} Crim R. 29(A) provides,
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction for such offense or offenses.
 {¶ 9} "Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach *Page 5 
different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v. Bridgeman (1978),55 Ohio St.2d 261, 381 N.E.2d 184, 9 O.O.3d 401, syllabus. This court has previously found that the Bridgeman standard "must be viewed in light of the sufficiency of evidence test * * * ." State v. Foster (Sept. 17, 1997), 3d Dist. No. 13-97-09, at *2.
 {¶ 10} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Jenks (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
 {¶ 11} Allsup was convicted of obstructing official business under R.C. 2921.31, which provides:
 (A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.
 (B) Whoever violates this section is guilty of obstructing official business. Except as otherwise provided in this division, obstructing official business is a misdemeanor of the second degree. If a violation of this section creates a risk of physical harm to any person, obstructing official business is a felony of the fifth degree. *Page 6 
 {¶ 12} This court has previously stated that there are five essential elements under R.C. 2921.31 including: "(1) an act by the defendant; (2) done with the purpose to prevent, obstruct, or delay a public official; (3) that actually hampers or impedes a public official; (4) while the official is acting in the performance of a lawful duty; and (5) the defendant does so act without a privilege to do so." State v.Brickner-Latham, 3d Dist. No. 13-05-26, 2006-Ohio-609, ¶ 25, citing R.C.2921.31(A); State v. Dice, 3d Dist. No. 9-04-41, 2005-Ohio-2505, ¶ 19. A defendant's failure to act "cannot provide the basis for finding one guilty of obstructing official business, because the text of the statute specifically requires an offender to act." State v. Brooks, 5th Dist. No. 06CA000024, 2007-Ohio-4025, ¶ 10, citations omitted.
 {¶ 13} In this case, Allsup was charged with obstructing official business, as a fifth degree felony, which also requires the element that the violation "creates a risk of physical harm to any person." R.C.2921.31(B).
 {¶ 14} At the trial, Joseph Carl, a patrolman at the Ada Police Department, testified: on July 31, 2006 he had contact with a female who identified herself as Roxanne Allsup at 309 Liberty Street in Ada; that the person who identified herself as Roxanne Allsup and Roxanne Scism were the same person; and there were outstanding bench warrants for Roxanne. (T. 4/10/07, 27-28). *Page 7 
 {¶ 15} Matthew Purdy, a patrolman with the Ada Police Department, testified that on July 31, 2006 he responded to 309 Liberty Street in order to execute a warrant for Roxanne Scism. (See Id. at 56). Patrolman Purdy was dressed in his uniform and was performing his official duties. (Id.) Patrolman Purdy testified that he went to the south door of the residence and knocked on the door with Patrolman Gatchell standing to his right, and right of Patrolman Gatchall was Sergeant Bollinger. (Id. at 58-59). Deputy Varian and Deputy Burgbacher were at the front sidewalk and stood out by the sidewalk at the edge of the street. (Id. at 59).
 {¶ 16} Patrolman Purdy testified that Allsup finally came to the door and "opened the door a couple inches, seen it was me in my uniform, and he slammed the door and started talking to me through the door." (Id. at 60). According to Purdy, Allsup asked him "what the f*** I wanted." (Id. at 60). Purdy testified, "I advised him that I wanted to talk to Roxanne, and I could tell he was already agitated with my presence, so I asked him again to talk to Roxanne. He said you're not talking to my b*** and get the f*** off my front porch." Id. Patrolman Purdy further testified, "* * * I was saying Wayne open the door, you know, this has nothing to do with you. I just need to talk to Roxanne. He said get the f*** off my property or I will shoot all you f***ing cops." (Id. at 61). Patrolman Purdy testified that the law enforcement officers "* * * backed off the *Page 8 
front porch because we took the threat very seriously." (Id.) The law enforcement officers backed off and took cover, and held the perimeter to make sure that no one came or left. (Id. at 62.) The law enforcement officers called in back-up, called the Kenton Police Department to have their apprehension dog show up, had Ada EMS on standby, and blocked off the street. (Id. at 65-69).
 {¶ 17} A search warrant was obtained, and the officers approached a different door. (Id. at 70; 72). Patrolman Purdy testified:
 PURDY: Okay. When we approached the north side of the door, I was standing, it'd be on the west side of the door, to my right. Officer Foulk and his partner were down at my knee. I did the first announcement police department, search warrant, and Officer Foulk took over. He did three warnings police department K9, come out or I will send my dog in and you will be bitten. He stated that three times.
 LIMERICK: While you're all on the outside?
 PURDY: While we're all on the outside.
 LIMERICK: Okay. Was Mr. Allsup or anybody making any comments?
 PURDY: Yes. Mr. Allsup was inside the residence screaming come on, come get me mother f***ers, I got something for you. As we were making our announcements. So we, I breached the door with the ram
 LIMERICK: Could you explain that process?
 PURDY: You take the ram and you hit the door knob of the door and break it open.
 PURDY: Yes ma'am.
 LIMERICK: Okay. And once you opened that north door that you showed us in State's Exhibit Two, what do you see inside the residence? Once the door is open?
 PURDY: I seen a kitchen and a doorway just to the south of the kitchen which ended up being the bedroom. We gave three more warnings with the dog repeating police K9, open the door *Page 9 or I'm gonna release my dog and you will be bitten. On the third one I seen hands come out through the door. As I'm standing at the door, drawed down
 LIMERICK: I'm gonna slow you down. The bedroom door, through the kitchen?
 PURDY: Yes, the bedroom door.
 LIMERICK: Through the kitchen. And
 PURDY: Located on the
 LIMERICK: you kind of pointed your hands. Can you verbally describe what you saw the hands doing?
 PURDY: The door was cracked open and I seen the hands coming out through the door. And I could tell they were empty, so at this time I ordered him, I could tell it was male hands. Wayne, come on out. You know, he came out with his hand up. Turned him around so he wouldn't face me and backed him to me. Apprehended him, took him outside, handcuffed him and secured him.
 LIMERICK: Okay.
 PURDY: Then the rest of us went in. We searched the whole residence for any occupants, found Roxanne in the same bedroom, and took her into custody also.
 LIMERICK: Pursuant to the warrants that you had?
 PURDY: Yes ma'am.
 LIMERICK: Up until that moment, did you have any idea if Wayne Allsup was armed with a firearm of any kind?
 PURDY: No ma'am.
(Id. at 74-77). Patrolman Purdy testified that he said "police department search warrant. Yelled it as loud as I could." (Id. at 92-93). Further, Patrolman Purdy testified:
 DONOHUE: Let me ask you a question. From the time you yelled search warrant to the time the first warning was issued, police department, K9, open the door or we'll let the dog in, how much time elapsed from that time to that warning?
 PURDY: Approximately ten, twenty seconds.
 DONOHUE: Okay. And the first three warnings, how much time elapsed between each one of them?
 PURDY: Just simultaneously *Page 10 
 DONOHUE: Bam, bam, bam?
 PURDY: Yes.
 DONOHUE: And the door was knocked in?
 PURDY: Yes, and then three more warnings.
 DONOHUE: Okay.
 PURDY: So he got a total of seven warnings that we were going to make entry into the house.
 * * *
 PURDY: I said police department search warrant, ten seconds went by, then the first set of three was simultaneously. But that was done by another officer.
 DONOHUE: But the door was knocked in after the first set of three, correct?
 PURDY: Yes.
 DONOHUE: So the door had to be approximately ten seconds, then bam, bam, bam, so we're talking twenty seconds from the time you gave the notice that the search warrant was there and the door got knocked in?
 PURDY: We didn't just mash the door in. There was a pause at the end of the last three.
 * * *
 PURDY: That pause, I don't know how long it was, so I can't testify to it. It was a short period.
 DONOHUE: During that, from that time that you stated that there was a search warrant there, to the time the door got knocked in, did you hear anything coming from the house?
 PURDY: Just tormenting.
 DONOHUE: Beg your pardon?
 PURDY: Tormenting. Coming from Mr. Allsup.
 DONOHUE: Well what was specifically said?
 PURDY: Come on mother f***ers, come in, come get me, I got something for ya, I'll take half of ya.
 DONOHUE: So what's the, how long was this tirade for? Are we talking two or three minute tirade?
 PURDY: The whole time we were doing the warnings.
 DONOHUE: I'm just saying, two or three minute tirade? From the time that you said there was a warrant to the time the door got knocked in?
 PURDY: Yes. *Page 11 
(T. 93-96).
 {¶ 18} Officer Carl testified that he went home after his shift and heard Officer Purdy requesting a battering ram over his portable radio so he went to the scene at 309 Liberty Street. (Id. at 29). Officer Purdy requested that Carl go to the police department to get personal information on Wayne Allsup and requested that he call Allsup's house and "advise him that this was his final warning, he needed to come out or we would be coming in to get him." (Id. at 30). According to Officer Carl, "Wayne stated uh bite me and something to the effect uh I needed a warrant and if we did come in, he would get half of us before we got him." (Id. at 30-31). Officer Carl then went back to 309 Liberty Street. (Id. at 31). Officer Carl testified that a search warrant was obtained. (Id. at 31). Further, Officer Carl stated:
 CARL: Uh I believe there were three verbal [warnings] before the door was hit. Stated that uh this was a K9 unit, he would be sent in and uh the suspect would be bit. Three times before and three times after the door was opened.
 LIMERICK: Before there was ever forced entry there was a warning, hey search warrant, we're gonna come in, we got a K9 Dog, come on out?
 CARL: Yes.
(Id. at 34).
 {¶ 19} Amber Webb, a dispatcher at the Ada Police Department, testified regarding three telephone calls from Allsup. The first phone call was at 10:45 p.m. and "* * * he told me that I needed to get my officers off his porch because *Page 12 
they were in a very dangerous position. And I told him that I did not have the authority to do that because I'm a dispatcher, and he told me that if I did not call the officers off his porch I would not be a dispatcher for very much longer." (Id. at 106). Webb asked Allsup if he was threatening her and he said yes. (Id. at 116). Webb testified:
 LIMERICK: * * * Did you take the nature of the phone call from Wayne Allsup to be directed about a lawsuit?
 WEBB: Yes.
 LIMERICK: And was that the only uh focus of the call that you got from Wayne Allsup?
 WEBB: Yes.
 LIMERICK: And you also said earlier that you took his statements as threats, is that right?
 WEBB: Yes.
 LIMERICK: Threats of what?
 WEBB: Threats of harm to the officers.
(Id. at 124), emphasis added.
 {¶ 20} According to Webb, Officer Carl then called Allsup and told him that it was "Wayne's last chance for him to come out on his own", Officer Carl then hung up and left. (Id. at 108).
 {¶ 21} Dispatcher Webb received a second call from Allsup about 11:00 p.m. (Id. at 109). Webb testified that during this call "he advised me to call my officers off again. Um started cussing and making threats and uh I actually got another phone call, so I hung up on Mr. Allsup." (Id.) According to Webb, Allsup "stated for me to get my f***ing officers off of his f***ing porch." (Id. at *Page 13 
109). The threats consisted of "he would do whatever it took to get the officers off his porch." (Id. at 110). Allsup called a third time at approximately 11:05 p.m., and as soon as he started making threats, the dispatcher hung up on him. (Id. at 111). At some point, Webb also received a telephone call from Roxanne. (Id. at 119).
 {¶ 22} The defense presented the testimony of Roxanne Scism and Allsup. Roxanne testified that she was Allsup's fiancé and she resided at 309 Liberty Street in Ada on July 31, 2006. (Id. at 141). Roxanne testified that Allsup told the officers to stay off of his property, and he made no threats. (Id. at 143-144). According to Roxanne, Allsup was just protecting his property. (Id. at 144). Roxanne testified that the law enforcement said they were going to break down the door, they broke down the door, and came into her bedroom. Roxanne testified that she was in bed, and they arrested her out of her bed. (Id. at 145.)
 {¶ 23} Allsup testified that the police officers told him that they wanted to talk to Roxanne, and that the officer did not tell him that they had an arrest warrant or a search warrant. (Id. at 162-163). According to Allsup, he testified that he told the police "to stay out of [his] house without a search warrant." (Id. at 164). Allsup testified: "They did not tell me they had a search warrant. They called me and said we're comin' in anyway. They did not say hey, we got a search warrant, can we talk to you now?" (Id. at 168-169). *Page 14 
 {¶ 24} In the present case, Allsup did not merely fail to act. Instead, Allsup yelled threats at the law enforcement officers including: "Come on mother f***ers, come in, come get me, I got something for ya, I'll take half of ya." (Id. at 95). The aforementioned statements constituted a threat to law enforcement officers, which was made after the law enforcement officers had announced at the door that they had a search warrant. Thus, Allsup's threats to the law enforcement officers constituted an affirmative act.
 {¶ 25} Allsup acted with the purpose to hinder or impede the law enforcement officers from performing their official duties when he made threats to the officers. Furthermore, Allsup's actions did impede the officers' execution of the search warrant. The law enforcement officers had to issue warnings that they would send in the K-9 and that the subject would be bit. The threatened use of the K-9 was due to Allsup's threats, and it hampered or impeded the officers in executing the search warrant that they had obtained. Allsup did not act with the privilege to do so because individuals are not free to threaten police officers with physical harm in order to hamper them in the execution of a search warrant.
 {¶ 26} Since Allsup was charged with felony obstructing official business, the prosecution also had to present evidence on the element that the violation creates a risk of physical harm to any person. R.C.2921.31(B). *Page 15 
 {¶ 27} In this case, the law enforcement officers had their weapons drawn when they executed the search warrant due to Allsup's threats and this action created a risk of physical harm to Roxanne and other people who happened to be in the area. In addition, law enforcement officers threatened to release the police K9 into the house, which presented a risk of physical harm to both Roxanne and Allsup.
 {¶ 28} Since we find that there was sufficient evidence to find Allsup guilty of obstructing official business due to Allsup's threats of harm, which were made after the police officers announced at the door that they had a search warrant, we need not discuss Allsup's arguments that Allsup's demand that the officer obtain a search warrant and his refusal to open the door could not constitute obstructing official business.
 {¶ 29} After reviewing the entire record, we hold that when viewing the evidence in a light most favorable to the prosecution, a rational jury could find the essential elements of obstructing official business proven beyond a reasonable doubt.
 {¶ 30} Consequently, Allsup's first assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. II The trial court erred in overruling the Defendant's Rule 29 Motion with respect to the charge of Telephone Harassment. *Page 16 
 {¶ 31} Allsup argues, in his second assignment of error, that he was alleged to have threatened Dispatcher Webb; however, there is no evidence that his purpose was to abuse, threaten, or harass. Further, Allsup argues that without evidence of a purpose to abuse, threaten, or harass, the prosecution did not prove an element of the offense, and thus, the trial court should have granted the Crim.R.29 motion.
 {¶ 32} This court has set forth the applicable legal standard to be considered for a Crim.R. 29 motion in our discussion of Allsup's first assignment of error.
 {¶ 33} Allsup was convicted of one count of telephone harassment, in violation of R.C. 2971.21(B) which provides: "No person shall make or cause to be made a telecommunication, or permit a telecommunication to be made from a telecommunications device under the person's control,with purpose to abuse, threaten, or harass another person." Emphasis added.
 {¶ 34} At trial, the following discussion occurred regarding the telephone calls:
 JUDGE: * * * Uh Ms. Limerick, just so that the court's understanding this. Counts five and six are meant to be, as you state in the indictment, subsequent offenses, therefore elevating them. In other words, counts three and four deal with the first phone call?
 LIMERICK: Yes sir.
 JUDGE: Counts five and six deal with the second phone call?
 LIMERICK: Count five absolutely deals with the second phone call.
 * * * *Page 17 
(T. 4/10/07, 134).
 {¶ 35} Since the prosecution specifically limited counts three and four to the first telephone call, this court will consider only the first telephone call for purposes of the telephone harassment conviction.
 {¶ 36} Dispatcher Webb testified that, during Allsup's first telephone call, "* * * he told me that I needed to get my officers off his porch because they were in a very dangerous position. And I told him that I did not have the authority to do that because I'm a dispatcher, and he told me that if I did not call the officers off his porch I would not be a dispatcher for very much longer." (Id. at 106). Webb asked Allsup if he was threatening her and he said yes. (Id. at 116). Webb testified:
 LIMERICK: * * * Did you take the nature of the phone call from Wayne Allsup to be directed about a lawsuit?
 WEBB: Yes.
 LIMERICK: And was that the only uh focus of the call that you got from Wayne Allsup?
 WEBB: Yes.
 LIMERICK: And you also said earlier that you took his statements as threats, is that right?
 WEBB: Yes.
 LIMERICK: Threats of what?
 WEBB: Threats of harm to the officers.
(Id. at 124), emphasis added.
 {¶ 37} Allsup's statement in the first call that the officers "were in a very dangerous position" constituted a threat. In addition, dispatcher Webb took the *Page 18 
statement to be a threat of harm to the officers. When viewing the evidence in a light most favorable to the prosecution, we find that a rational jury could have found that Allsup made the first telephone call with the purpose to threaten, harass, or abuse another person. Accordingly, we hold that there was sufficient evidence for the jury to find Allsup guilty of telephone harassment under R.C. 2971.21(B).
 {¶ 38} Allsup's second assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. Ill The Defendant's conviction for telephone harassment is against the manifest weight of the evidence.
 {¶ 39} In his third assignment of error, Allsup argues that his conviction for telephone harassment was against the manifest weight of the evidence. According to Allsup, the jury may have been influenced to find him guilty of telephone harassment due to the evidence presented on the second and third telephone calls. Allsup argues that there were no instructions from the trial court which informed the jury that they were only to consider the first telephone call.
 {¶ 40} When determining whether a conviction is against the manifest weight of the evidence a reviewing court must examine the entire record, "`[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that *Page 19 
the conviction must be reversed and a new trial ordered.'" State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quotingState v. Martin (1983), 20 Ohio App. 3d 172, 175, 485 N.E. 2d 717.
 {¶ 41} In the previous assignment of error, we found that there was sufficient evidence for the jury to find Allsup guilty of telephone harassment based solely on the first telephone call. The record does not contain any defense requests that the trial court issue a jury instruction stating that the jury could only consider the first telephone call. Although the prosecution introduced evidence regarding the second and third telephone calls, the record does not establish that the jury clearly lost its way or created a miscarriage of justice when it found Allsup guilty of telephone harassment.
 {¶ 42} Allsup's third assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. IV The Defendant's conviction for aggravated menacing was against the manifest weight of the evidence.
 {¶ 43} Allsup maintains, in this assignment of error, that his conviction is against the manifest weight of the evidence because Officer Purdy was the only officer who testified about the threats to the officers, and there were other officers present who would presumably have heard the threats. In addition, Allsup points to the fact that he denied making any threats. In his reply brief, Allsup also argues *Page 20 
that without testimony regarding whether the officers believed Allsup would cause them serious physical harm, the conviction cannot stand.[1]
 {¶ 44} This court previously set forth the manifest weight of the evidence standard in Allsup's third assignment of error.
 {¶ 45} Credibility determinations are primarily a matter for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "A conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact."State v. Haydon (Dec. 22, 1999), 9th Dist. No. 19094, at *7, citingState v. Gilliam (Aug. 12, 1998), Lorain App. No. 97CA006757, at *4.
 {¶ 46} Allsup was convicted of aggravated menacing pursuant to R.C.2903.21, which states: "(A) No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family."
 {¶ 47} Both Patrolman Carl and Patrolman Purdy testified regarding Allsup's threatening statements. Patrolman Carl testified, "Wayne stated uh bite *Page 21 
me and something to the effect uh I needed a warrant and uh if we did come in, he would get half of us before we got him." (T. 4/10/07, 30-31).
 {¶ 48} Patrolman Purdy testified that he went up to the porch and advised Allsup that he wanted to talk to Roxanne. (Id. at 60). According to Patrolman Purdy, Allsup said "you're not talking to my b*** and get the f*** off my front porch." (Id. at 61). Further, Patrolman Purdy testified:
 PURDY: I stood there and tried to de-escalate the situation `cause I could tell he was very agitated with our presence. I was saying Wayne open the door, you know, this has nothing to do with you. I just need to talk to Roxanne. He said get the f*** off my property or I will shoot all you f***ing cops.
 LIMERICK: What'd you do then?
 PURDY: I still, once again, I tried Wayne, you know, we can deal with this, just open up the door and let us talk about it. And again he stated get the f* * * off my property. At that time Sergeant Bollinger, Patrolman Gatchell and myself backed off the front porch because we took the threat very seriously. And we backed off to the sidewalk, back, took cover and we started discussing what our next strategy was going to be.
(Id. at 61-62), emphasis added. Patrolman Purdy also testified that Allsup said, "Come on mother f* * *er, come in, come get me, I got something for ya, I'll take half of ya." (Id. at 95).
 {¶ 49} Although Allsup testified that he did not make threats, Patrolman Carl and Patrolman Purdy testified regarding threats that Allsup made to law enforcement officers. The credibility of witnesses is an issue to be determined by the trier of fact. DeHass (1967),10 Ohio St.2d at 231. As a result, the mere fact *Page 22 
that there was conflicting testimony in the record regarding whether threats were made does not mean that the conviction is against the manifest weight of the evidence. See Haydon (Dec. 22, 1999), 9th Dist. No. 19094, at *7.
 {¶ 50} Moreover, while the law enforcement officers did not testify that they believed that Allsup would cause them serious physical harm, there is evidence in the record to show that the officers took the threats seriously. Officer Purdy testified that they took Allsup's threats seriously. The law enforcement officers also called in back-up units, including a K9 unit, had EMS on standy, and blocked off the street. The law enforcement officers' actions indicate that they believed that Allsup would cause them serious physical harm.[2]
 {¶ 51} After reviewing the record, we cannot find that the jury clearly lost its way or created a manifest miscarriage of justice when it found Allsup guilty of aggravated menacing. Accordingly, we overrule Allsup's fourth assignment of error.
 {¶ 52} Having found no error prejudicial to appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 ROGERS and WILLAMOWSKI, JJ., concur.
[1] In its brief, the appellee states: "the question is whether the defendant caused the officers to believe that he would cause serious physical harm to them." Thus, we choose to address appellant's argument in its reply brief regarding testimony on whether the officers believed that Allsup would cause them physical harm.
[2] This court notes that if the prosecutor would have directly asked Patrolman Carl and Patrolman Purdy whether they believed that Allsup would cause them serious physical harm, it would have greatly simplified this issue. *Page 1