**[Cite as *State v. Tunstall*, 2024-Ohio-2376.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29946 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 02112 |
| | : | |
| DONNIE D. TUNSTALL | : | (Criminal Appeal from Common Pleas Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on June 21, 2024

. . . . . . . . . . .

CHIMA R. EKEH, Attorney for Appellant

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

**{¶ 1}** Defendant Donnie D. Tunstall appeals from his convictions for murder, felonious assault, having weapons under disability, carrying a concealed weapon, and obstructing official business. For the reasons set forth below, we affirm.

**I.      Factual and Procedural History**

{¶ 2} This case arises from the shooting death of Daniel Burch. Following an investigation, Tunstall was indicted on two counts of murder (proximate result), one count of felonious assault (deadly weapon), and one count of felonious assault (serious physical harm), each of which carried an attendant firearm specification. He was also indicted on one count of having a weapon under disability, one count of carrying a concealed weapon, and one count of obstructing official business. The charge of obstructing official business included an allegation that he committed the offense in a manner that created a risk of physical harm to any person, which elevated the degree of the offense.

{¶ 3} Tunstall filed a notice of self-defense in which he asserted he shot Burch after Burch had threatened and assaulted him. The matter proceeded to a jury trial.

{¶ 4} The evidence presented at trial established that Tunstall had been romantically involved with a woman named Felicia when a lawnmower was stolen from her front porch on June 18, 2021. Felicia's security camera captured the theft. Tunstall, who was acquainted with Burch, believed Burch was the person shown on the camera.

{¶ 5} On June 22, 2021, Burch was at a BP station on Salem Avenue, which was approximately two blocks from Felicia's home. While there, he spoke with an acquaintance, Yolanda Turner. Tunstall approached Turner and Burch while they were talking and stated that Burch was "coming with him." According to Turner, she heard Tunstall mention something about a lawnmower. Burch and Tunstall then walked away from the station toward an alley that ran between the station and an abandoned building.

{¶ 6} As Burch and Tunstall approached the alley, they passed two men who were working on a truck near the edge of the station's parking lot. One of the men, Antonio Taylor, heard Tunstall say to Burch "I'm gonna f**k you up" if Burch was identified by an

unnamed person. The other man, Anthony Knolton, was underneath the truck when Burch and Tunstall walked by, and he heard one of the men state, "if they point you out, I'm going to f**k you up."

{¶ 7} Approximately three minutes later, numerous gunshots were heard coming from the direction of the alley. The shots paused for approximately 12 seconds, and then more shots were heard. Taylor and Knolton ran toward the alley. Eventually, they looked over a fence that ran along the alley and observed Burch lying on his back in tall brush in the backyard of a property known as the Lexington Lodge. Taylor saw Tunstall walking away through the Lexington Lodge property.

{¶ 8} Due to an unrelated event which ended just prior to the shooting, numerous Dayton Police officers were already in the area. A description of Tunstall was broadcast over the police radio, and he was quickly apprehended. Burch, who was still alive, was transported to a hospital. He later succumbed to his injuries.

{¶ 9} Montgomery County Deputy Coroner Lee Lehman, who had performed an autopsy on Burch, testified that Burch had gunshot entrance wounds to his left forehead and his left cheek by the corner of his mouth. Lehman testified that the shot to the forehead caused pieces of Burch's skull to embed in his brain; this shot would have been immediately fatal. Burch also had two gunshot entrance wounds to his back and an entrance wound to his left buttock. The bullet to the buttock traveled through Burch's bowels, bladder, and iliac vein. The damage to the vein resulted in heavy bleeding and would have been fatal within a matter of minutes. Lehman testified that Burch also had a gunshot to his chest just below his armpit, which had caused his lung to collapse, and multiple gunshot wounds to his arms. In all, Burch had been shot 13 times. According

to Lehman, Burch also had significant bruising to the right side of his brain consistent with a hard blow. He further testified that an examination of Burch's hands revealed no injuries to his knuckles, such as bruising or swelling, consistent with a fist fight.

{¶ 10} Tunstall testified in his own defense. According to Tunstall, he encountered Burch on two separate days shortly after the theft of the lawnmower. On the first occasion, Tunstall confronted Burch about the stolen lawnmower; Burch denied stealing it, and Tunstall did not pursue the matter because he had a child with him and believed Burch was armed. On the second occasion, Tunstall and Burch discussed Tunstall's purchase of marijuana from Burch at a BP station, and they walked toward the alley behind the Lexington Lodge while discussing the purchase. This eventually led to a physical altercation between the two men. According to Tunstall, he shot Burch after being "sucker-punched" and slung to the ground by him and after Burch had produced a "spike," which he held between his fingers, and attempted to charge Tunstall.

{¶ 11} Tunstall was found guilty by a jury of murder and felonious assault (serious physical harm), as well as the attached firearm specifications. The jury entered a finding of not guilty on the charge of felonious assault (deadly weapon). The jury also found Burch guilty of carrying a concealed weapon and of obstructing official business with a finding that Tunstall created a risk of physical harm to any person. Tunstall had waived his right to a jury trial on the count of having a weapon under disability, and the trial court found him guilty on that count. Tunstall was sentenced to an aggregate prison term of 26 years to life. He was also found to be a violent offender subject to registration with the violent offender registry.

{¶ 12} Tunstall appeals.

## II.     Self-Defense

{¶ 13} Tunstall's first assignment of error states:

THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT TUNSTALL'S USE OF DEADLY FORCE WAS NOT IN SELF-DEFENSE.

{¶ 14} Tunstall challenges his convictions for felonious assault and felony murder, claiming that the evidence demonstrated that he acted in self-defense.

{¶ 15} Effective March 28, 2019, revisions made to the self-defense statute, R.C. 2901.05, "place[d] the burden on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt." *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31.   Specifically, the statute now provides, in pertinent part, as follows:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

R.C. 2901.05(B)(1).

{¶ 16} " 'The elements of self-defense in the use of deadly force are: (1) the

defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such a danger was in the use of such force. *State v. Cunningham*, 2d Dist. Montgomery No. 29122, 2023-Ohio-157, ¶ 14.

{¶ 17} These elements are explained in *State v. Azali*, 8th Dist. Cuyahoga No. 112299, 2023-Ohio-4643:

"The first * * * [element] of the self-defense test—whether the defendant was at fault in creating the situation giving rise to the affray— asks, in essence, whether the defendant was the initial aggressor." *State v. Gardner*, 8th Dist. Cuyahoga No. 110606, 2022-Ohio-381, ¶ 25. " 'This concept is broader than simply not being the immediate aggressor. A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense.' " *State v. Gaston*, 8th Dist. Cuyahoga No. 98904, 2013-Ohio-2331, ¶ 16, quoting *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002-Ohio-415.

"[T]he second element of self-defense involves both objective and subjective considerations." *State v. Hughkeith*, 2023-Ohio-1217, 212 N.E.3d 1147, ¶ 56 (8th Dist.). A defendant's belief that he was in immediate danger of death or great bodily harm must be objectively reasonable, and the defendant must have an honest belief that he was in such imminent danger. *Id.* " '[I]f the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that [he] was in imminent danger.' " *Id.*, quoting *State v. Thomas*, 77

Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997).

" 'Implicit in th[e] second element of self-defense, i.e., that the defendant's use of deadly force was in 'good faith,' is the requirement that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *State v. Ratliff*, supra, at ¶ 31, quoting *State v. Hendrickson*, 4th Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 31. "Accordingly, this court has held that the force used to defend must be at once objectively reasonable and necessary under the facts and circumstances of the case." *Id.*, citing *State v. Johnson*, 8th Dist. Cuyahoga No. 110673, 2022-Ohio-2577, ¶ 15. If the amount of force used is so disproportionate that it shows an "unreasonable purpose to injure" the defense of self-defense is unavailable. *State v. Reyes-Figueroa*, 2020-Ohio-4460, 158 N.E.3d 939, ¶ 27 (8th Dist.).

*Id.* at ¶ 27-29.

{¶ 18} On appeal, the State's burden of disproving Tunstall's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review. *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 27. When conducting a manifest weight review, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A

case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 19} Tunstall, who knew Burch prior to the shooting, testified that he encountered Burch at a local park the day before the shooting. According to Tunstall, he approached Burch and asked him about the theft of the lawnmower. Tunstall stated that Burch had denied the theft, at which point Tunstall informed him about the security camera footage. Tunstall testified that he ended the encounter because he had a child with him, and he noticed that Burch had a gun in his pocket.

{¶ 20} Tunstall testified that he went to the BP station the next day, where he saw Burch again. Tunstall stated that he passed Burch on his way into the store, at which time Burch indicated that he had marijuana to sell. When Tunstall exited the store, he approached Burch, who was then talking to two women. The pair then walked through the parking lot toward Tunstall's car, which was parked on the side of the Lexington Lodge. Tunstall testified that, as they were walking, Burch indicated that he did not want to go on the street and instead directed Tunstall to walk down the alley behind the Lexington Lodge; when they entered the alley, Tunstall pulled out his wallet, and Burch told Tunstall to give him the money in the wallet so he (Burch) could go to a nearby residence and get marijuana from his "people." Tunstall then stated that, while at the BP station, Burch had indicated that he had the marijuana in his possession. According to Tunstall, when Tunstall was reluctant to give his money to Burch, Burch became angry and began to poke him above his eye. Tunstall testified that he swatted Burch's hand away from his face and told Burch he was leaving.

{¶ 21} According to Tunstall, he had walked a few paces away when Burch "sucker punched" him in the temple.   Tunstall claims he fell to the ground and Burch got on him and began punching him on the top of the head.   Tunstall testified that as he tried to get up, Burch grabbed him by his dreadlocks and slung him to the ground; Burch then demanded Tunstall turn over his wallet.   The scuffle continued until the men "fell apart" from each other.   Tunstall testified that he was getting to his feet when he saw Burch "fumbling in his pockets."   Tunstall thought that Burch might have a gun, but Burch instead pulled out a "spike" which he placed between his fingers.   Tunstall testified that he immediately pulled out his own gun and told Burch to back away from him.   Tunstall's testimony was not entirely clear, but it appears that Burch did back up approximately four to five feet.   Then, at some point, Burch threatened to kill Tunstall and began to advance toward him.   Tunstall pulled the trigger on his gun, but it did not discharge.   When Burch observed this, he tried to "rush" Tunstall.   Before Burch could reach him, Tunstall was able to pull the hammer on the gun, eject the bullet, and get a new round into the chamber. He then began to fire at Burch.   Tunstall testified that he stopped shooting, but Burch "came back at [him]," and he started firing again.   After Tunstall stopped shooting, he ran away. Tunstall testified that he ran from the police because he was on federal probation for a prior bank robbery and was not allowed to have a gun.

{¶ 22} As previously noted, to refute Tunstall's trial testimony, the State presented the testimony of Turner, the acquaintance with whom Burch spoke at BP; she testified that when Tunstall approached Burch and her, he mentioned a lawnmower.   Additionally, witnesses Taylor and Knolton both testified that one of the men made a statement about harming the other if he was identified by some other person or persons.   Although

Knolton did not see which man made the statement, Taylor identified Tunstall as the speaker. This testimony, if believed, served to contradict Tunstall's claims that he engaged with Burch for the purpose of purchasing marijuana and suggested that, instead, he initiated the encounter in order to confront Burch about the theft of the lawnmower.

{¶ 23} Additionally, the State presented evidence that Tunstall did not initially inform any police officer that Burch had attacked him. Indeed, during the first ten minutes of his police interview with Dayton police detective Zachary Williams, Tunstall denied knowledge of a shooting. He insisted that he had merely purchased some "weed" just prior to being arrested. It was not until Det. Williams revealed that the discarded gun had been located that Tunstall changed his story. Then, as he began to explain the events of the incident, he again stated that he had been buying marijuana and that the shooting had had nothing to do with a lawnmower. (The interviewing detectives had not mentioned anything about a lawnmower at the point that Tunstall made this statement.) Tunstall stated that while he was trying to make the marijuana purchase, Burch had grabbed him, punched him, and tried to steal his wallet. But at no point in the interview did Tunstall assert that Burch had had any type of weapon. Williams, who was also an EMT, examined Tunstall; other than a scratch to his arm, Tunstall showed no signs of injury to his body or head. Further, as noted by the coroner, Burch did not have any bruising, swelling, or abrasions on his hands to indicate he had punched Tunstall. A reasonable juror could have concluded that these inconsistencies discredited Tunstall's testimony.

{¶ 24} We also note that Tunstall testified he was in the alley by the fence when Burch first attacked him, causing him to fall to the ground. Tunstall claimed he tried to stand, but Burch grabbed him and "slung" him to the ground several times. He testified

that when he began firing his gun, Burch was also in the alley. Tunstall testified that Burch ran through the fence gate into the yard where his body was found. Tunstall also stated he stood at the gate and continued to fire his gun as Burch ran away.

{¶ 25} The State presented evidence that on the day of the shooting, the alley had numerous puddles and was muddy, yet Tunstall had not gotten dirty while allegedly on the ground. Further, the State presented evidence that the shell casings from Tunstall's gun were found well-inside the fenced area. According to police testimony, the location of the casings demonstrated that Tunstall was not standing at the gate when he fired his gun but was, instead, in the yard with Burch. Given that Tunstall's trial testimony was inconsistent with his statements to Williams, the jury could have concluded that he was not credible in his claim of self-defense.

{¶ 26} Finally, the jury could have reasonably concluded that Tunstall had used excessive or disproportionate force based upon Tunstall shooting Burch 13 times and admitting that he continued to shoot as Burch ran away.

{¶ 27} The jury, as the trier of fact, was free to believe all, part, or none of the testimony of each witness and to draw any reasonable inferences from the evidence presented at trial. *State v. Gipp*, 2d Dist. Montgomery No. 27635, 2017-Ohio-8907, ¶ 14, quoting *State v. Fields*, 2d Dist. Clark No. 2016-CA-76, 2017-Ohio-7745, ¶ 42, citing *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. After reviewing the record, we cannot say that the jury clearly lost its way or created a manifest miscarriage of justice when it found the State had proven beyond a reasonable doubt that Tunstall did not act in self-defense. Accordingly, the first assignment of error is overruled.

### III.     Special Finding on Risk of Physical Harm

{¶ 28} The second and third assignments of error asserted by Tunstall state:

THE WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THE JURY'S SPECIAL FINDING THAT TUNSTALL'S OBSTRUCTION OF OFFICIAL BUSINESS CREATED A RISK OF PHYSICAL HARM TO PERSONS.

THE JURY'S SPECIAL FINDING THAT TUNSTALL'S OBSTRUCTION OF OFFICIAL BUSINESS CREATED A RISK OF PHYSICAL HARM TO PERSONS WAS BASED ON INSUFFICIENT EVIDENCE.

{¶ 29} Tunstall concedes he committed the offense of obstructing official business by running from the police and throwing his gun into nearby plants.  However, he contends the State failed to produce evidence sufficient to demonstrate that he created a risk of physical harm to any person when he committed the offense.  He further claims the finding that he created a risk of physical harm was against the manifest weight of the evidence.

{¶ 30} "[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law."  *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  As stated above, an examination under the manifest weight of the evidence standard requires weighing the evidence and the credibility of the witnesses to determine whether the jury lost its way.  While sufficiency

and manifest weight involve different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). As a result, a determination that a conviction is supported by the weight of the evidence will also be dispositive of sufficiency. *State v. Farra*, 2d Dist. Montgomery No. 28950, 2022-Ohio-1421, ¶ 50.

{¶ 31} Obstructing official business is proscribed by R.C. 2921.31(A), which provides that "[n]o person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." The offense, which normally is a misdemeanor, is elevated to a fifth-degree felony when the violation "creates a risk of physical harm to any person." R.C. 2921.31(B).

{¶ 32} The record discloses that Dayton Police Officer Nathan Speelman was in the area when the shots were fired. According to Speelman's testimony, he was driving on North Broadway Street, approximately two blocks west of the BP station, when he observed an individual matching the suspect's description. Speelman stopped his cruiser by an alley, exited, and confronted the man, later identified as Tunstall. Speelman ordered Tunstall to the ground; Tunstall, however, turned and ran down the alley. Speelman gave chase down the alley, which ended in front of a garage. He chased Tunstall around the garage through overgrown brush and debris. When Tunstall

ran back to the front of the garage, Speelman caught up to him and again ordered him to the ground. Tunstall did not comply, and Speelman discharged his Taser. The Taser failed to connect properly, and Tunstall again ran around the side of the garage. Speelman ultimately tackled him to the ground in an area of overgrown brush, where the two men struggled. Ultimately, two other officers arrived on the scene and helped Speelman get Tunstall into handcuffs. Tunstall's loaded gun was subsequently located nearby in some brush.

{¶ 33} Speelman testified that, because he believed he was pursuing an armed suspect, he initially had his weapon drawn while chasing Tunstall. However, he eventually holstered his weapon due to his concern that he might accidentally discharge the gun because he had to pursue Tunstall around obstacles and through the overgrown terrain.

{¶ 34} Ohio law indicates that the potential risk of harm required by R.C. 2921.31(B) need not be large. *State v. Woodson*, 9th Dist. Wayne No. 07CA44, 2008-Ohio-1469, ¶ 27. Officers face a risk of physical harm when they are required to pursue an offender and retrieve a loaded weapon. *Id.* at ¶ 28. Further, the jury could reasonably have found that there was a risk of harm to anyone else in the vicinity of the foot chase, given that both Tunstall and Speelman were running with loaded weapons in their possession. *See State v. Allsup*, 3rd Dist. Hardin No. 6-07-13, 2008-Ohio-159, ¶ 27.

{¶ 35} Additionally, Detective Williams testified about the search for Tunstall's firearm. He testified that the alley where the gun was located was "highly traveled" by people in the neighborhood, including children. He testified that the "biggest concern"

with a discarded gun is the risk that a child might find it and harm him or herself or another person. Thus, a jury could have reasonably concluded that, by hiding a loaded gun in the underbrush, Tunstall had created a risk of harm that the gun would be found and discharged.

{¶ 36} Based upon our review of the record, we conclude there was sufficient evidence that Tunstall's actions created a risk of harm to himself, Speelman, and any bystanders in the area. Further, we conclude the jury's finding that he created a risk of physical harm was not against the manifest weight of the evidence.

{¶ 37} Accordingly, the second and third assignments of error are overruled.

## IV. Conclusion

{¶ 38} All of Tunstall's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .


EPLEY, P.J. and LEWIS, J., concur.