[Cite as *State v. Sorrell*, 2023-Ohio-2101.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                    CASE NO.  13-22-11

      v.

ERIC J. SORRELL,                           O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 22 CR 0020

Judgment Affirmed

Date of Decision:   June 26, 2023

APPEARANCES:

    *Brian A. Smith*  for Appellant

    *Rebeka Beresh* for Appellee

**MILLER, P.J.**

{¶1} Defendant-appellant, Eric J. Sorrell, appeals the August 3, 2022 judgment of sentence of the Seneca County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case arises from a January 18, 2022 incident in which law enforcement was dispatched to 628 Columbus Avenue in Fostoria, Ohio for a report of a domestic incident. The victim, W.F., alleged that she had been physically assaulted by Sorrell, her live-in boyfriend, over the course of several days. When law enforcement arrived at the residence, Sorrell shut himself in his bedroom and refused to leave for several hours. He also made threats to set fire to the residence.

{¶3} On February 9, 2022, the Seneca County Grand Jury indicted Sorrell on two counts: Count One of domestic violence in violation of R.C. 2919.25(A), (D)(4), a third-degree felony and Count Two of obstructing official business in violation of R.C. 2921.31(A), (B), a fifth-degree felony. At the arraignment held on February 15, 2022, Sorrell entered pleas of not guilty.

{¶4} Following a trial held on July 18-19, 2022, the jury found Sorrell guilty of both charges. The trial court accepted the jury's verdicts and entered findings of guilty against Sorrell as to the charges in the indictment. The judgment entry of conviction was filed on July 19, 2022.

{¶5} At the sentencing hearing held on August 3, 2022, the trial court sentenced Sorrell to 24 months in prison on Count One and 12 months in prison on Count Two and ordered the sentences to be served concurrently.

{¶6} Sorrell filed a notice of appeal on August 31, 2022. He raises three assignments of error for our review.

## First Assignment of Error

**Because the jury lost its way and created a manifest miscarriage of justice in finding Appellant guilty, Appellant's convictions were against the manifest weight of the evidence.**

{¶7} In his first assignment of error, Sorrell argues that his convictions are against the manifest weight of the evidence. Specifically, Sorrell argues that the weight of the evidence demonstrated that Sorrell's actions underlying his domestic-violence conviction were made in self-defense. With respect to his obstructing-official-business conviction, Sorrell argues that the greater weight of credible evidence established that Sorrell's actions did not create a risk of physical harm.

*Standard for Manifest-Weight Review*

{¶8} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction

must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

### *Sorrell's Convictions*

**{¶9}** Sorrell was found guilty of domestic violence and obstructing official business. The offense of domestic violence is codified at R.C. 2919.25(A) and provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." Sorrell attempted to assert a self-defense claim as to this allegation.

R.C. 2901.05(B)(1), states as follows:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in

self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶10}** "Under the current version of R.C. 2901.05, if evidence is presented 'that tends to support' that the defendant used the force in self-defense, the *prosecution* must prove beyond a reasonable doubt that the accused did not act in self-defense." (Emphasis sic.) *State v. Flory*, 3d Dist. Van Wert No. 15-20-02, 2020-Ohio-5136, ¶ 43.

**{¶11}** Sorrell was also convicted of obstructing official business in violation of R.C. 2921.31(A). To obtain a conviction for obstructing official business the State must prove that (1) the defendant acted (2) without privilege to do so and (3) with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity and that (4) the defendant's act hampered or impeded the public official (5) in the performance of the public official's lawful duties. *See State v. Pierce*, 3d Dist. Seneca No. 13-16-36, 2017-Ohio-4223, ¶ 11, quoting *State v. Dice*, 3d Dist. Marion No. 9-04-41, 2005-Ohio-2505, ¶ 19, citing R.C. 2921.31(A). Furthermore, the jury found that in violating R.C. 2921.31(A), Sorrell created a risk of physical harm to any person, making his conviction a fifth-degree felony. *See* R.C. 2921.31(B).

**{¶12}** At trial, W.F., the victim, testified she has lived at 628 Columbus Avenue in Fostoria, Ohio for approximately ten years. (July 18-19, 2022 Tr. at 141). W.F. identified Sorrell as her boyfriend of approximately 18 years who was living

in the Columbus Avenue residence with her on January 17-18, 2022. (*Id.* at 142-143).

{¶13} According to W.F., on January 17, 2022, Sorrell asked W.F. if she "called him a name." (*Id.* at 143). That conversation then "escalate[d] into an argument." (*Id.*). W.F. testified that shortly thereafter, Sorrell approached W.F., who was sitting on the couch in the living room of their home, grabbed her package of cigarettes and started twisting and breaking the cigarettes and throwing them in W.F.'s face. (*Id.*). W.F. stated that when she stood up and reached for the package of cigarettes, Sorrell "latched onto" W.F.'s left arm and "just keep squeezing it." (*Id.*). W.F. testified that she told Sorrell that he was hurting her and repeatedly asked him to let go of her arm. (*Id.* at 143-144). However, rather than complying, Sorrell squeezed her arm harder. (*Id.* at 144). W.F. recalled that she became panicked because she believed that Sorrell was cutting off the circulation to her arm. (*Id.*). W.F. stated that, in an effort to defend herself and to force Sorrell to let go of her arm, she attempted to bite Sorrell. (*Id.*). However, W.F. quickly realized that she was not wearing her top partial denture, making her attempt unsuccessful. (*Id.*). Nonetheless, eventually Sorrell finally let go of W.F.'s arm. (*Id.*).

{¶14} W.F. testified that after she got away from Sorrell, she locked herself in the bathroom and assessed her injuries. (July 18-19, 2022 Tr. at 144). Specifically, W.F. immediately noticed that her arm was beginning to bruise and

observed that the bruise was in the imprint of Sorrell's hand. (*Id.*). W.F. described feeling "[f]rightened" during this time and even contemplated jumping out the bathroom window in an attempt to escape from Sorrell. (*Id.*).

{¶15} Late in the following day, January 18, 2022, W.F. woke and discovered that Sorrell was still at the residence. (*Id.* at 145-146). However, at some point during the day, Sorrell left the residence with some of his belongings. (*Id.* at 146). W.F. testified that when Sorrell left, she locked the doors of the house and called her mother and some of her friends trying to determine her best course of action. (*Id.*). W.F. stated that she believed the situation with Sorrell was "escalating out of [her] control" and she felt as though she was unable to get help. (*Id.*).

{¶16} Approximately 15 minutes after he left, Sorrell returned to the residence. (*Id.*). W.F. stated that Sorrell did not attempt to knock on the front door or call her. (*Id.* at 146-147). Rather, W.F. heard the dogs barking outside the bathroom window, and when she investigated the commotion, she discovered Sorrell attempting to enter the home through the bathroom window. (*Id.* at 147). W.F. recalled that she immediately called 911. (*Id.*). While W.F. was on the phone with the 911 dispatcher, Sorrell entered the home through the bathroom window. (*Id.*). W.F. described Sorrell's behavior upon entering the residence as "belligerent,

absurd, and vulgar[].” (*Id.* at 148). According to W.F., Sorrell threatened W.F. not to tell law enforcement about his actions. (*Id.*).

{¶17} Then, Sorrell went into his bedroom, and W.F. heard him “barricad[e]” his bedroom door shut. (July 18-19, 2022 Tr. at 147). W.F. testified she was fearful for her life, and she ran outside the house to wait for law enforcement officers to arrive on the scene. (*Id.* at 148-149).

{¶18} W.F. denied that she had access to a weapon on January 17-18, 2022. (*Id.* at 150). She also denied ever threatening to kill or harm Sorrell. (*Id.*). W.F. testified that, aside from the bite mark on January 17, 2022, she did not cause any injury to Sorrell. (*Id.*). W.F. described herself as being in “bad health” at the time of trial and at the time of the incident. (*Id.* at 149, 151). W.F. explained that she fought cervical, uterine, and colon cancer and suffers from bowel obstructions, which causes “severe weight drop.” (*Id.* at 151). W.F. stated that Sorrell knew the details of her health and knew that her poor health prevented her from being able to defend herself. (*Id.*).

{¶19} State’s Exhibits 1, 2, 3, and 4, which depict W.F.’s physical injuries and condition on January 18, 2021, were introduced as evidence. (July 18-19, 2022 Tr. at 145). The photographs show a hand print on W.F.’s arm and bruises to her back. (*Id.*); (State’s Exs. 1, 2, 3, 4).

{¶20} According to W.F., Sorrell had a system of surveillance cameras monitoring the inside and outside of the property, including the living room. (July 18-19, 2022 Tr. at 158-159). She stated that Sorrell monitored the cameras using a computer in his bedroom and had the ability to monitor the police on January 18, 2022. (*Id.* at 159). W.F. stated that Sorrell's father came to the house the day after Sorrell's arrest on the instant offenses and removed the computer from the residence "because it had evidence on it." (*Id.*).

{¶21} Sergeant Nate Elliott, ("Sergeant Elliott") a sergeant for the City of Fostoria Police Department, testified he was dispatched to 628 Columbus Avenue on January 18, 2022 for a complaint of a domestic situation involving the suspect entering the home through a window. (*Id.* at 122, 124-125). When he arrived on the scene, he spoke to W.F. whom Sergeant Elliott described as "frantic." (*Id.* at 125).

{¶22} According to Sergeant Elliott, Sorrell was barricaded inside a bedroom. (*Id.*). When Sergeant Elliott arrived on the scene, Sorrell was yelling for law enforcement officers to leave the residence. (*Id.* at 125-126). Sergeant Elliott stated that, at the beginning of his contact with Sorrell, they had a "somewhat normal conversation" but that over the span of approximately one and one-half hours, Sorrell became "extremely agitated." (*Id.* at 127). Sergeant Elliott recalled Sorrell

stating he was going to die that day, threatened to stab law enforcement officers, and threatened to burn the house down. (*Id.*).

**{¶23}** While Sorrell remained barricaded in his room, the officers learned the residence was a duplex and another occupant was present in the upstairs residence. (July 18-19, 2022 Tr. at 127-129). Due to Sorrell's threats of stabbing officers and burning down the house, law enforcement officers evacuated the other resident. (*Id.* at 127-128). Fearing the situation might not be resolved peacefully, the initial officers on the scene called in the special response team and crisis negotiation team ("CNT") from the Tiffin Police Department to assist. (*Id.* at 128). Sergeant Elliott stated that he attempted to negotiate with Sorrell for approximately one and one-half hours before Officer Brent Riley with the CNT arrived and began working with Sorrell. (*Id.* at 130). Furthermore, during the course of the incident, Sorrell informed Sergeant Elliott he consumed medication in an attempt to take his own life. (*Id.* at 131). Sergeant Elliott testified that Sorrell created a risk of physical harm to W.F., law enforcement officers that were on the scene, and the occupant of the upstairs apartment through his actions. (*Id.* at 131).

**{¶24}** Eventually, Sorrell exited the bedroom. (*Id.* at 130). He was immediately placed in custody and evaluated by first responders on the scene. (*Id.* at 131). Sergeant Elliott testified he did not observe any injuries to Sorrell's person. (*Id.* at 132). Nevertheless, Sorrell was transported by ambulance to the local

hospital for further evaluation and medical care due to the volume of medication he ingested. (*Id.* at 131).

{¶25} Sergeant Elliott testified that although Sorrell did not set fire to the property, law enforcement officers did locate lighters inside the bedroom. (July 18-19, 2022 Tr. at 135). Sergeant Elliott also clarified that when Sorrell eventually emerged from his bedroom, he did not resist arrest. (*Id.* at 137). Sergeant Elliott described Sorrell as being "so impaired" by the medications he had taken that "there was no fight left in him." (*Id.*).

{¶26} Officer Jennifer Muro, a patrol officer with the City of Fostoria Police Department testified that she spoke to W.F. at the scene and described W.F.'s demeanor as "[v]ery anxious" and "upset." (*Id.* at 164-165, 167, 170). Officer Muro also recalled that W.F. believed she had an active CPO against Sorrell and she was "very worried" that she would be arrested for allowing Sorrell to live at her residence. (*Id.* at 170). Officer Muro described W.F. as "very small." (*Id.*). Officer Muro stated that she was not sure how strong W.F. was but that she appeared "unhealthy" and "malnourished." (*Id.* at 170-171). Officer Muro also identified State's Exhibits 1, 2, 3, and 4 as photographs that she took on January 18, 2022 depicting bruising to W.F.'s left arm and abrasions to her back which W.F. informed Officer Muro that she received on January 17, 2022 from Sorrell. (*Id.* at 169); (State's Ex. Nos. 1, 2, 3, 4). The State introduced State's Exhibits 5, 6, 7, and 8,

which were various documents indicating that Sorrell was charged with and convicted of domestic violence on two previous occasions. (July 18-19, 2022 Tr. at 172-175); (State's Exs. 5, 6, 7, 8).

{¶27} The State rested its case, and Sorrell took the stand in his own defense. (July 18-19, 2022 Tr. at 186, 188). Sorrell stated that he had been in a relationship with W.F. for approximately 20 years. (*Id.* at 189-190). He stated that he "love[s] [W.F.] will all [his] heart" and would never hit or hurt her. (*Id.* at 190).

{¶28} Sorrell claimed that on January 17, 2022, he picked up a package of cigarettes from the coffee table, took them back to his bedroom, and shut the door. (*Id.* at 193-194). According to Sorrell, several seconds later, W.F. flung open the bedroom door and began berating Sorrell for taking "her" cigarettes and demanded Sorrell return the cigarettes. (*Id.* at 194). Sorrell testified that he refused to give W.F. the package of cigarettes because he paid for them and because W.F. was calling him names. (*Id.*).

{¶29} Sorrell stated that he was sitting in his chair holding the cigarettes in his hand when W.F. put one of her hands on Sorrell's wrist and one on his hand. (July 18-19, 2022 Tr. at 194). Sorrell testified that he put one of his hands up in an effort to "push [W.F.] back" from him, but that she did not move back and continued to try to retrieve the cigarettes from Sorrell's hand. (*Id.* at 194-195). Then, W.F.

began biting Sorrell's arm in an effort to get him to release the cigarettes. (*Id.* at 195).

**{¶30}** During the struggle, Sorrell stated he squeezed the cigarettes, crushing them. (*Id.*). According to Sorrell, when W.F. realized the cigarettes had been destroyed, she let go of Sorrell and struck him on his left temple, breaking his eyeglasses. (*Id.*). Sorrell explained that he threw the cigarettes down and, while still seated in his chair, grabbed W.F. by both of her arms and used her body to pull himself up from the chair. (*Id.* at 195-196). Sorrell stood up, while still holding W.F. by the arms, walked her backward approximately four feet, and let go of her once she cleared the threshold of the bedroom door. (*Id.* at 196).

**{¶31}** Then, he closed the door and stood up against it, blocking her from reentering the room. (*Id.*). Sorrell claims that while he was holding her by the forearms, W.F. continued to "fight[] [him]" by spitting on him, biting him, and kicking him. (*Id.* at 198). Sorrell speculated that W.F.'s actions of attempting to fight him while he had her forearms restrained caused her injury. (*Id.*). Sorrell stated "the only reason I can think [of] that [W.F.] would have bruises * * * is because she was trying to pull away from me and I wasn't letting her move, because she had been hitting me in my face. She * * * broke my glasses. I just wasn't going to chance letting her go." (*Id.*).

{¶32} Shortly thereafter, Sorrell sat back down in his chair. (*Id.* at 196). Less than a minute later, the door flung open and W.F. came back into the bedroom and began hitting Sorrell on the right shoulder and arm with a kitchen broom until it snapped in half. (*Id.*). Sorrell testified that he grabbed the piece of broom that remained in W.F.'s hand, and jerked it out of her hand causing her to flee the bedroom. (*Id.*). Sorrell claimed W.F. came into the room a third time and started smacking Sorrell in the face with a dirty kitchen mop. (*Id.* at 197). Sorrell testified that, while still sitting in the chair, he grabbed the mop from her hand and "yank[ed]" it away from her. (*Id.*). W.F. then "flew backwards" into the doorframe. (*Id.*). According to Sorrell, W.F. left the bedroom, Sorrell shut the bedroom door behind her, and the two did not have further interaction for the rest of the night. (*Id.*).

{¶33} The following morning, Sorrell awoke and walked out of the bedroom to find W.F. watching television in the living room "in * * * normal spirits." (July 18-19, 2022 Tr. at 199). Because Sorrell believed everything to be "okay," he continued with his normal morning routine. (*Id.*). At approximately 4:00 p.m., W.F. took a nap for several hours. (*Id.* at 200). Sorrell became hungry, so he woke up W.F. to inform her that he was going to leave the house to get something to eat. (*Id.*). W.F. asked him if she could run an errand first, and she left the residence for approximately ten minutes. (*Id.* at 200-201). When she returned, she told Sorrell

that he needed to "stay away" from the residence that night. (*Id.* at 201). Sorrell testified that he told W.F. that he was not willing to do so, and she threatened to lock him out of the house and call the police if he returned. (*Id.* at 201-202). Sorrell claimed he reminded W.F. that he has security cameras throughout the home and stated that, if the police arrived at the house, he would show them the recording of the incident the previous evening. (*Id.* at 202). Sorrell's statement enraged W.F., and she ripped the cord from the camera in the living room in an apparent failed attempt to destroy the camera and the footage. (*Id.* at 202-203).

{¶34} After first unlocking the bathroom window, Sorrell left the home to purchase food and cigarettes. (*Id.* at 203). When Sorrell returned to the residence, he discovered the door was locked. (*Id.* at 203-204). Sorrell heard W.F. on the other side of the door telling him he was not allowed inside the house. (*Id.* at 204). So, Sorrell pushed open the unlocked bathroom window to gain entrance to the residence. (*Id.*). Sorrell overheard W.F. on the phone with the 911 dispatcher telling them that someone was breaking into her home. (*Id.*). Sorrell then pulled his body through the window and onto the bathroom floor. (*Id.* at 204-205). Sorrell recalled that, when he landed on the floor, his back was instantly in severe pain. (*Id.* at 205). Sorrell, who knew the police were on their way, walked into the bedroom. (*Id.* at 205-207).

{¶35} Sorrell claimed that, when law enforcement arrived, he slammed his bedroom door shut. (*Id.* at 207). When officers asked him to open the door, he refused to do so because he was sick, in pain, and wanted to be left alone. (*Id.*). Sorrell admitted he threated to end his life. (*Id.* at 207-208). After barricading the bedroom door, Sorrell watched the live feed from his surveillance cameras and observed law enforcement officers surrounding his home. (*Id.* at 209-210). The police presence caused Sorrell to panic. (*Id.*). Sorrell refused law enforcement officer's repeated requests for him to exit his room. (*Id.* at 210). Rather, he told the officers, "If you guys don't get out of my house, I'm going to burn myself up." (*Id.*). Sorrell denied threatening to stab officers. (*Id.*).

{¶36} Sorrell attempted to make a deal with law enforcement that he would leave his room if the officers agreed to take the SD cards from his security cameras, which he claimed depicted that he was "an innocent man." (July 18-19, 2022 Tr. at 210-211). However, according to Sorrell, law enforcement officers refused the proposal. (*Id.* at 211-212). Sorrell stated that he eventually came out of his room because he was "feeling really sick," concerned that his dogs were hurting each other, and "just wanted it to be over." (*Id.* at 211). According to Sorrell, he had taken all of the "nerve blocker pills" available to him, and he was beginning to feel very sick. (*Id.* at 211-212).

{¶37} Sorrell stated that, despite W.F.'s appearance, she is "actually a pretty physically fit girl" who dances for a hobby. (*Id.* at 213). Sorrell stated that he received a black eye and other injuries during the incident. (*Id.*). Sorrell claimed that, following his arrest, officers, took photographs of his injuries. (*Id.* at 195).

{¶38} On cross-examination, Sorrell admitted that he had been convicted of domestic violence twice before—once in 2003 and once in 2009. (*Id.* at 215). Sorrell stated that he has text messages showing that W.F. threatened him in the past. (*Id.* at 216-217). Sorrell claimed that, as of the time of trial, W.F. still had access to the surveillance cameras and SD cards. (*Id.* at 217-218, 227). Sorrell denied that his father collected the SD cards or surveillance cameras from the residence. (*Id.* at 217-218, 227-228).

{¶39} Sorrell stated that he weighs 300 pounds and is approximately 6 feet 4 inches tall. (July 18-19, 2022 Tr. at 213, 218-219). According to Sorrell, W.F. weighs approximately 105 pounds and is approximately 5 feet 9 inches tall. (*Id.*). Sorrell described W.F. as "a frail woman." (*Id.* at 234). Despite their extreme differences in size, Sorrell claimed that W.F. "inflicted [the bruises] on herself because she wouldn't stop moving her arms around trying to pull away from [him]" as he restrained her forearms. (*Id.* at 219). Sorrell asserted he did not have any choice but to restrain W.F. because she was trying to hit him. (*Id.* at 220-221).

{¶40} Sorrell claimed he was not in fear of his life when W.F. was hitting him, but he "just wanted her to stop." (*Id.* at 221, 223-224). Sorrell claimed his actions "were self-defense because she was punching me * * * in my face." (*Id.* at 221). When asked again if he feared W.F. on January 17 or January 18, 2022, Sorrell responded:

> I've answered your question more than once. I told you, no * * * I was not fearing for my life. She was hitting me, man. She was hitting me. She punched me in my face. She was standing over top of me. She's grabbing on me. She's trying to take my stuff from me. She's pulling on my shirt. I wasn't scared of [W.F.]. I just wanted her to get the hell away from me, get her out of my room. That's all I wanted. I ain't scared of [W.F.]. I love [W.F.].

(*Id.* at 224).

{¶41} Sorrell also confirmed he told officers he wanted to end his life that day, and he wanted to "burn up." (July 18-19, 2022 Tr. at 232-233). He also conceded that if he "burned up," he most likely would set the house on fire. (*Id.* at 233).

{¶42} After reviewing the evidence, we do not find Sorrell's domestic-violence conviction is against the manifest weight of the evidence. Sorrell's arguments are predicated on the assumption that W.F. is not a credible witness. However, "[w]hen there is a conflict in the testimony of witnesses, it is for the trier of fact to determine the weight and credibility to be given to such evidence." *State v. Robinson*, 12th Dist. Butler No. CA2018-08-163, 2019-Ohio-3144, ¶ 29. The

jury may "take note of any inconsistencies in the testimony and resolve them accordingly, believing all, part, or none of each witness's testimony." *State v. Lark*, 12th Dist. Fayette No. CA2018-08-004, 2018-Ohio-4940, ¶ 29. Ultimately, "'a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version.'" *State v. Smith*, 3d Dist. Marion No. 9-20-50, 2021-Ohio-3404, ¶ 26, quoting *State v. Ferrell*, 10th Dist. Franklin No. 19AP-816, 2020-Ohio-6879, ¶ 59.

{¶43} In this case, Sorrell's trial counsel attacked W.F.'s credibility, as well as the credibility of the State's other witnesses. Additionally, through cross-examination of W.F. and through Sorrell's testimony, the jury was provided with many potential grounds upon which to discount W.F.'s allegations and accept Sorrell's claim that his actions were made in self-defense. The fact the jury chose to believe W.F. despite Sorrell's attempts to discredit her and provide other potential explanations does not render Sorrell's domestic-violence conviction against the manifest weight of the evidence.

{¶44} With respect to his conviction for obstructing official business, Sorrell argues only that the jury erred by finding that he "create[d] a risk of physical harm to any person" under R.C. 2921.31(B). Sorrell argues the weight of the evidence does not demonstrate that he attempted to cause harm to any person through his threats to end his life, burn the house down, or stab the officers. We first note that

some of the arguments Sorrell makes in his appellate brief with respect to this issue are directly contradicted by record. For instance, Sorrell argues there was not a significant possibility he would attempt to die by suicide by taking pills inside the bedroom because there was "no evidence" that the police found pills in the bedroom or "even that Sorrell had access to the pills while barricaded inside." (Appellant's Brief at 9). However, Sorrell admitted at trial that he actually did consume pills with the purpose of ending his life. *See State v. Gannon*, 9th Dist. Medina No. 19CA0053-M, 2020-Ohio-3075, ¶ 15 ("[W]hile Gannon contends that he took no action to increase the risk of physical harm, we are mindful that the statute is satisfied when a defendant increases the risk of physical harm to any person, including himself.").

**{¶45}** Furthermore, by Sorrell's own admission, he threatened to "burn himself," which, he conceded would likely result in the house catching fire. Accordingly, he posed a risk of harm not only to himself, but also to the upstairs occupant of the dwelling, W.F., and the many law enforcement officers on the scene. It is also not disputed that, while barricaded in his room, Sorrell actually had access to lighters, giving him the means to start a fire. *See State v. Woodson*, 9th Dist. Wayne No. 07CA0044, 2008-Ohio-1469, ¶ 27 ("[T]he potential risk of injury to an officer in pursuit of a suspect need not be a large one in order to support a conviction for obstruction of official business."). Additionally, according to Sergeant Elliott,

Sorrell threatened to stab law enforcement officers. Although Sorrell denies he made the threat to officers, the jury was free to believe Sergeant Elliott's version of events. Accordingly, we find that Sorrell's conviction for obstructing official business was not against the manifest weight of the evidence.

**{¶46}** Sorrell's first assignment of error is overruled.

**{¶47}** For ease of discussion, we will address Sorrell's second and third assignments of error together.

### Second Assignment of Error

**Because the performance of Appellant's trial counsel fell below an objective standard of reasonable representation and prejudiced Appellant by failing to introduce evidence that Appellant acted in self-defense, including, but not limited to, SD cards from the home camera system, text messages between Appellant and the alleged victim, and pictures of Appellant's injuries, the performance of Appellant's trial counsel constituted ineffective assistance of counsel, in violation of Appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

### Third Assignment of Error

**Because the performance of Appellant's trial counsel fell below an objective standard of reasonable representation and prejudiced Appellant by failing to object to repeated questions asked of Appellant on cross-examination, the performance of Appellant's trial counsel constituted ineffective assistance of counsel, in violation of Appellant's right to counsel under the**

**Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

**{¶48}** In his second and third assignments of error, Sorrell argues he received ineffective assistance of trial counsel. In his second assignment of error, Sorrell asserts his trial counsel was ineffective for failing to introduce certain evidence which Sorrell alleges demonstrates he acted in self-defense. In his third assignment of error, Sorrell argues his trial counsel was ineffective for failing to object to the State's purported "repeated questioning" of Sorrell during cross-examination and by failing to engage in redirect examination of Sorrell. For the reasons that follow, we disagree.

**{¶49}** "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 12th Dist. Clinton No. CA2019-05-010, 2020-Ohio-3072, ¶ 45. A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is

-22-

entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

{¶50} Prejudice results when "'there is a reasonable probability, that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

{¶51} We first address Sorrell's argument that his trial counsel was ineffective for failing to introduce certain pieces of evidence allegedly tending to show that Sorrell acted in self-defense. Specifically, Sorrell contends his trial counsel was ineffective for failing to introduce SD cards from his home security system, photographs of the injuries Sorrell allegedly received during the incident, and text messages Sorrell received from W.F. However, the materials that Sorrell references, if they even exist, are not contained in the record. Accordingly, we cannot properly conclude whether his trial counsel performed deficiently or whether

Sorrell was prejudiced. "If an ineffective assistance of counsel claim concerns facts that are outside the record, we cannot consider the claim on direct appeal because we can only consider matters contained in the record." *State v. Hall*, 10th Dist. Franklin No. 04AP-1242, 2005-Ohio-5162, ¶ 60. Accordingly, we could only speculate as to whether it was unreasonable for Sorrell's trial counsel not to introduce the evidence at issue. For example, with respect to the SD cards from the home security system, it is unclear whether the evidence exists. At trial, W.F. stated that, on the day following Sorrell's arrest, Sorrell's father came to the residence and took Sorrell's computer and the SD cards. (July 18-19, 2022 Tr. at 158-159). Sorrell denied this allegation and stated that W.F. possessed the SD cards. (*Id.* at 218, 227). Accordingly, it is unclear who had possession of the SD cards or even if the SD cards really exist. It is likewise unclear that the photographs of Sorrell's injuries or the text message communication actually exist. "Defense counsel cannot be found to be ineffective by failing to present or proffer evidence that does not exist." *State v. Jackson*, 2d Dist. Montgomery No. 26050, 2015-Ohio-5490, ¶ 30. Thus, from the record before us, we are unable to determine whether Sorrell's trial counsel was ineffective. Accordingly, Sorrell failed to establish that his trial counsel's failure to introduce the specified pieces of evidence constituted ineffective assistance of counsel. *State v. Nurein*, 3d Dist. Union No. 14-21-18, 2022-Ohio-1711, ¶ 61.

{¶52} Sorrell's second assignment of error is overruled.

{¶53} Next, we review Sorrell's claim that his trial counsel was ineffective for failing to object to the State's repeated questions to Sorrell. Specifically, Sorrell argues that his trial counsel was ineffective for failing to object to several questions relating to whether Sorrell was in fear of bodily harm from W.F. In response to the questions, Sorrell indicated he was not fearful of W.F. and he did not fear for his life, but, rather, he forcibly moved W.F. because he wanted her to quit hitting him. (July 18-19, 2022 Tr. at 223-226). Sorrell also claims his trial counsel was ineffective for failing to object when the State asked Sorrell twice about his past convictions for domestic violence. (*Id.* at. 215, 240). Sorrell argues his trial counsel's failure to object to the repeated questions prejudiced him by reducing his credibility with the jury. Sorrell further alleges his trial counsel "compounded" the error of failing to object by not conducting a redirect examination of Sorrell.

{¶54} "'[A]n attorney's decision as to whether or not to object at certain times during trial is presumptively considered a trial tactic or strategy that we will not disturb.'" *State v. Lane*, 3d Dist. Allen No. 1-21-33, 2022-Ohio-3775, ¶ 81, quoting *State v. Blair*, 4th Dist. Washington No. 14CA33, 2016-Ohio-2872, ¶ 108. Indeed, after reviewing the record, we find that Sorrell's trial counsel's decision not to object to the repeated questions could have been a valid trial strategy.

**{¶55}** Furthermore, with respect to Sorrell's argument that his trial counsel was ineffective for failing to conduct a redirect examination of him was also a valid trial strategy. It is clear from the record that Sorrell became increasing irritated during the State's cross-examination and, near the end of the cross-examination stated that he was "done testifying" and made a futile attempt to invoke his Fifth Amendment right to remain silent. (July 18-19, 2022 Tr. at 240-241). Accordingly, there is no indication that if his trial counsel had conducted redirect examination, Sorrell's answers would have been helpful to his defense or changed the outcome of the trial. *See State v. Laws*, 3d Dist. Allen No. 1-20-10, 2021-Ohio-166, ¶ 49.

**{¶56}** Sorrell's third assignment of error is overruled.

**{¶57}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Seneca County Court of Common Pleas.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**