[Cite as *State v. Petteway*, 2017-Ohio-716.]


STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 16 JE 0004 |
| VS. | ) | |
| | ) | OPINION |
| KEISHA R. PETTEWAY | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from the Court of Common Pleas of Jefferson County, Ohio
Case No. 15 CR 102 (B)

JUDGMENT:     Affirmed.

APPEARANCES:
For Plaintiff-Appellee

Attorney Jane Hanlin
Jefferson County Prosecutor
16001 State Route 7
Steubenville, Ohio 43952

For Defendant-Appellant

Attorney Eric Reszke
Suite 810, Sinclair Building
100 North 4th Street
Steubenville, Ohio 43952

JUDGES:

Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Cheryl L. Waite


Dated: February 27, 2017

DeGENARO, J.

{¶1} Defendant-Appellant, Keisha R. Petteway, appeals the trial court's judgment convicting her of obstructing official business and sentencing her accordingly. On appeal, she asserts her conviction is against the manifest weight of the evidence. As Petteway's assignment of error is meritless, the judgment of the trial court is affirmed.

**Facts and Procedural History**

{¶2} Petteway was indicted on one count of obstructing official business, R.C. 2921.31(B), a fifth-degree felony. It was alleged that her conduct interfered with the arrest of her boyfriend, Anthony Carr, Jr., and further caused an increased risk of physical harm to Carr and others. Carr was charged with four separate counts in the same indictment, but his case proceeded separately.

{¶3} Petteway was arraigned and pled not guilty. The matter proceeded to a jury trial where the following evidence was adduced. Sergeant Jeffrey Bernard of the Ohio State Highway Patrol testified that just past 3:00 a.m. on June 7th, he pulled Carr over for speeding and lane violations. Carr pulled into the driveway of his home and exited his vehicle before Sgt. Bernard could exit his cruiser. Carr got back inside his vehicle, but refused to provide his driver's license. When Sgt. Bernard attempted to grab him by his arm to get him out the vehicle, Carr jerked his arm away and told the trooper not to touch him. Carr then phoned Petteway and asked her to come outside. Sgt. Bernard testified that he heard Carr tell Petteway to "get him," and in fact, Carr is heard saying this on the dash cam video.

{¶4} Once outside, Petteway attempted to record a video of the incident with her cell phone. Carr got out of his vehicle again. At that point, Sgt. Bernard ordered Petteway to "get back," but she did not comply. Sgt. Bernard then contacted dispatch and requested assistance. A struggle ensued between Sgt. Bernard and Carr, who refused to comply with the trooper's directives. Specifically, Carr dove back in to his vehicle over the center console into the passenger seat and began reaching for the door handle. Sgt. Bernard dove after Carr and both men went out the passenger door; the trooper landing on top of Carr. Carr attempted to get onto his hands and

knees to get off of the ground. Sgt. Bernard began to strike Carr on the arm with his flashlight in an attempt to control him and place handcuffs on him, but Carr refused to submit.

**{¶5}** While this was occurring, and despite prior orders to stay back, Petteway "pursued" Sgt. Bernard as he was attempting to gain control of Carr. Specifically, Petteway came around to the passenger side of the vehicle, yelling at Sgt. Bernard to stop hitting Carr. She stood over and behind Sgt. Bernard while the two men continued to struggle. Sgt. Bernard said he feared Petteway was going to hit him. The trooper added that he would have subdued Carr more quickly had Petteway not been standing over and in such close proximity to him while he struggled with Carr. According to his training, he should have continued to strike Carr in an effort to subdue him. However, due to his concern that it would escalate the situation with Petteway, he felt he could not continue to hit Carr.

**{¶6}** As Carr continued to resist, Petteway continued to follow the men, remaining within several feet of them. Sgt. Bernard observed that Carr was attempting to retrieve something from the waistband of his pants, but the trooper's attention was divided because of Petteway. The men were in front of the cruiser at that point and Petteway was "overtop" of them again. Then, as Carr attempted to get up, the trooper saw a pistol magazine lying on the ground under Carr's waist area. Acting under the belief that Carr had a weapon, Sgt. Bernard drew his service weapon, placed it on Carr's back and pulled the trigger; however, the pistol did not fire. At this point, Petteway remained within several feet of the two men and was yelling. As Carr continued to resist; Sgt. Bernard had one arm on Carr and the other hand on his service revolver.

**{¶7}** At that point, Steubenville Police Officer Smarrella arrived and ordered Petteway to get back; however, she failed to comply and Smarrella had to shove her away. Subsequently, Petteway entered Carr's vehicle while the two officers struggled with Carr. Sgt. Bernard stated that this was distracting due to Officer Smarrella having to focus his attention on Petteway rather than Carr. According to Sgt. Bernard

this gave Carr the opportunity to put his hands back into his waistband at that moment.

**{¶8}** Later a third officer, Trooper Michael Grant, arrived at the scene. Eventually Carr was brought under control and handcuffed. Sgt. Bernard testified that at this point he noticed a bulge in Carr's underwear. The bulge turned out to be a packet of cocaine, and they learned the magazine found on the ground actually belonged to Sgt. Bernard, having fallen off of his duty belt during the struggle with Carr.

**{¶9}** Sgt. Bernard testified that both he and Officer Smarrella were at a risk of physical harm due to the interference of Petteway during the detention and the arrest of Carr. Sgt. Bernard also said he received scarring on his hands as a result of his confrontation with Carr.

**{¶10}** Petteway's phone was seized; however, ultimately no video was recovered from the phone. Sgt. Bernard's dash cam video of the incident was admitted as a State's exhibit and played while Sgt. Bernard was testifying. Sgt. Bernard identified eight separate occasions on the video when Petteway interfered with his ability to safely and properly gain control of Carr. Sgt. Bernard specifically testified that the situation never would have escalated to the point where he had to draw his weapon and attempt to fire it had Petteway complied with his requests to back away from the scene.

**{¶11}** On cross-examination, defense counsel presented Sgt. Bernard with two written reports he made in connection with the incident. Sgt. Bernard conceded that the reports failed to specifically mention that Petteway's conduct caused a risk of physical harm to those at the scene. Sgt. Bernard also agreed that Petteway never touched him, threatened him, lunged at him, hit him, or got between him and Carr. Sgt. Bernard agreed that Petteway made no motion or movements that showed an attempt to hit or kick him. He further agreed that Petteway said nothing to incite Carr to further non-compliance.

**{¶12}** The State also presented the testimony of Officer Smarrella and

Trooper Grant, which supported Sgt. Bernard's testimony, to the extent that they were present. Additionally, Officer Smarrella added that there was no doubt in his mind that Petteway heard him order her more than once to "get back." Further, he testified that he was forced to take the pressure and focus off of Carr, whom he believed had a firearm, because Petteway mentioned the word "gun" before she attempted to enter the car. This can be heard on the dash cam video, although it sounds like Petteway was actually saying: "he ain't got no f*cking gun." In addition, Smarrella said he had to reach for his duty weapon when he saw Petteway go into the car while the other officers struggled with Carr. Officer Smarrella testified that Carr would have been secured much more quickly had it not been for the actions of Petteway.

{¶13} Trooper Grant added that when he arrived Sgt. Bernard and Officer Smarrella were wrestling on the ground with Carr in an attempt to gain control of him. Instead of being able to help immediately with that effort, the trooper had to deal with Petteway which caused a delay in securing Carr.

{¶14} The defense presented no witness testimony, but did present as exhibits the two reports made by Sgt. Bernard.

{¶15} After considering all of the evidence, the jury found Petteway guilty of felony obstructing official business. Following a hearing, the trial court sentenced her to 30 days in jail to be followed by three years of community control.

**Manifest Weight**

{¶16} In her sole assignment of error, Petteway asserts:

> The jury verdict of guilty to the offense of obstructing official business
> was against the manifest weight of the evidence.

{¶17} "Weight of the evidence concerns the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other." (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A conviction will only be reversed as against the manifest weight of the

evidence in exceptional circumstances. *Id*. This is so because the triers of fact are in a better position to determine credibility issues, since they personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

{¶18} Thus, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, 678 N.E.2d 541. However, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99 CA 149, 2002-Ohio-1152, *2, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Under these circumstances, the verdict is not against the manifest weight and is affirmed.

{¶19} Petteway was convicted of one count of obstructing official business, R.C. 2921.31(A), a fifth-degree felony pursuant to R.C. 2921.31(B).

> (A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.
>
> (B) Whoever violates this section is guilty of obstructing official business. Except as otherwise provided in this division, obstructing official business is a misdemeanor of the second degree. If a violation of this section creates a risk of physical harm to any person, obstructing official business is a felony of the fifth degree.

R.C. 2921.31.

**{¶20}** The term "physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

**{¶21}** Petteway asserts that the jury's verdict was against the manifest weight of the evidence with regard to the risk of physical harm element. R.C. 2921.31(B). That finding elevated the offense from a second-degree misdemeanor to a fifth-degree felony. *Id.* Petteway argues the jury lost its way because she did not strike, touch, threaten or physically block any law enforcement officer from detaining and arresting Carr. She further claims she did nothing to encourage Carr to physically resist law enforcement officers.

**{¶22}** The State counters that such acts are not required for a conviction under subsection (B); rather, it need only to prove that the defendant's act of obstructing caused "a risk of physical harm to any person[.]" R.C. 2921.31(B).

**{¶23}** In *State v. Woodson*, 9th Dist. No. 07CA0044, 2008-Ohio-1469, the Ninth District held that a conviction for felony obstructing official business was not against the manifest weight of the evidence where the defendant ran away from the officers, one officer injured his hand while climbing a fence in pursuit of him, and officers subsequently retrieved a loaded revolver that had been discarded by one of the defendants at the scene. *Id.* at ¶ 3-4; 24-29. "A suspect who creates a significant delay by ignoring an officer's repeated orders impedes his ability to perform his lawful duties and violates R.C. 2921.31. * * * Furthermore, the potential risk of injury to an officer in pursuit of a suspect need not be a large one in order to support a conviction for obstruction of official business." *Woodson* at ¶ 27, citing *State v. Skinner*, 9th Dist. No. 06CA009023, 2007-Ohio-5601, ¶ 24 (internal citation omitted) (upholding obstruction conviction after officers chased suspect through dark, wooded terrain and officer testified that it would have been easy to twist an ankle).

**{¶24}** In *State v. Allsup*, 3d Dist. No. 6-07-13, 2008-Ohio-159, the Third District concluded there was sufficient evidence supporting a felony-level obstructing official business conviction, where, due to the defendant's threats, law enforcement officers were forced to draw their weapons during the execution of a search warrant,

and forced to release a police K9 into the house, which presented a risk of physical harm to the defendant and his companion. *Id.* at ¶ 26-29.

**{¶25}** Finally, in *State v. Harris*, 2015-Ohio-5378, 56 N.E.3d 286, ¶ 9-12 (9th Dist.), our sister district concluded there was sufficient evidence of the risk of physical harm to persons element where the defendant reportedly had a gun and where he retreated into his residence, which, according to police, turned the matter into a "potential hostage situation," and compelled the deputy to follow him into residence with his weapon drawn, presenting a risk of physical harm to the deputy and Harris' wife, whom the deputy encountered while working his way through the home.) *See also State v. Vactor*, 9th Dist. No. 02CA008068, 2003-Ohio-7195, ¶ 38-40 (sufficient evidence of "risk of physical harm" to an officer when the officer fell to the ground when he was attempting to restrain the defendant, causing pain in the officer's wrist.).

**{¶26}** Here Sgt. Bernard identified eight separate occasions when Petteway interfered with his ability to safely and properly gain control of Carr. Sgt. Bernard specifically testified that the situation never would have escalated to the point where he had to draw his weapon and attempt to fire it had Petteway complied with his requests to back away from the scene. Put simply, Petteway's actions and interference with the lawful duties of the officers nearly resulted in Carr being shot in the back by Sgt. Bernard; clearly this constitutes a risk of physical harm.

**{¶27}** Sgt. Bernard also testified that Petteway's conduct prolonged his struggle with Carr and that his hands were injured in the process. In addition, Petteway's own failure to follow Officer Smerrella's order to "back up," caused the officer to physically shove her out of the way. Officer Smarrella also had to resort to reaching for his duty weapon when he saw Petteway attempting to enter Carr's vehicle after she had failed to heed prior warnings to stay back from the scene.

**{¶28}** It was well within the province of the jury to find the law enforcement officers' testimony credible, especially considering it was supported by the dash cam video of the incident.

**{¶29}** In sum, the jury did not lose its way in convicting Petteway of felony

obstructing official business. Accordingly, Petteway's sole assignment of error is meritless and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Waite, J., concurs.