[Cite as *State v. Elston*, 2026-Ohio-682.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio

    Appellee

v.

Darryl Elston Jr.

    Appellant

Court of Appeals No. WD-25-006

Trial Court No. 2024 CR 0277

**DECISION AND JUDGMENT**

Decided: February 27, 2026

* * * * *

Paul A. Dobson, Wood County Prosecutor, and
Brian O. Boos, Deputy Chief Assistant Prosecutor, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Darryl Elston Jr., appeals from a judgment entered by the Wood County Court of Common Pleas convicting him, following a jury trial, of receiving stolen property, failure to comply with an order or signal of a police officer, and obstructing official business. For the reasons that follow, the trial court's judgment is affirmed.

## Statement of the Case and of the Facts

## Pretrial

{¶ 2} On July 25, 2024, the Wood County grand jury returned an indictment charging appellant with six felony offenses arising out of a vehicular pursuit that occurred on July 11, 2024. The charges included one count of receiving stolen property, a felony of the fourth degree; one count of failure to comply with an order or signal of a police officer, a felony of the third degree; two counts of having weapons while under disability, felonies of the third degree; one count of tampering with evidence, a felony of the third degree; and one count of obstructing official business, a felony of the fifth degree.

{¶ 3} Appellant's trial counsel was appointed in September 2024. At several points during the pretrial proceedings that followed, appellant expressed complaints concerning his understanding of the case and, relatedly, his communication with his counsel. In response to those complaints, the trial court -- on more than one occasion -- directed appellant and his counsel to meet in the trial court jury room to review and discuss various aspects of the case, including certain discovery that had been produced by the State. The trial court scheduled the first jury room meeting for November 6, 2024. A second such meeting was ordered to take place immediately, just days before trial, at a pretrial hearing that was held on January 28, 2025, after appellant made such comments as "[e]xplain everything to me is my concern. I don't know how to move forward," and "I

2.

don't know how to go forward. Do I go forward with a jury trial? Is it better to go with a bench trial? Do I take a plea here?" Eventually, the case proceeded to a jury trial.

**Trial**

**The State's Case**

{¶ 4} At trial, the State presented evidence of the following. In the days leading up to July 11, 2024, appellant connected with S.W. on the Grindr application and spent some time at S.W.'s residence in Detroit. When appellant left, he took S.W.'s car without S.W.'s permission. Once S.W. realized that appellant had taken his car, he messaged appellant making clear that appellant did not have permission to have the vehicle. When appellant refused to return the vehicle, S.W. reported to the Detroit Police that his vehicle was stolen.

{¶ 5} On July 11, 2024, Sgt. Brandon Lewis of the Rossford Police Department received information that the Toledo Police had been involved in a pursuit with a stolen vehicle – later confirmed to be S.W.'s stolen vehicle – and had subsequently abandoned the chase. Sgt. Lewis encountered the subject vehicle and, activating his overhead lights and sirens, attempted to execute a traffic stop on Lime City Road. Appellant, who was driving the vehicle, took flight, speeding away from Lewis and a second pursuing officer, Officer Tyler Nagy, at 70 to 80 miles per hour in a 35 mile per hour zone. While making his escape, appellant fled into oncoming lanes of traffic, causing one motorist to swerve off the road to avoid a collision. Heading towards a bridge on Lime City Road that was under construction and impassable, appellant abruptly turned into the yard of a residential property. At that point, Sgt. Lewis purposely rammed S.W.'s vehicle with his own,

3.

causing both vehicles to come to a stop. Appellant abandoned S.W.'s vehicle and ran back to the area of the bridge construction, with Lewis and Nagy chasing him on foot. In his effort to elude the police, appellant made his way down an embankment and onto Interstate 75, which runs beneath and perpendicular to Lime City Road. Appellant crossed eight lanes of highway traffic before running into a nearby wooded area. Sgt. Lewis and two other officers, including Officer Nagy, testified that they saw appellant carrying a firearm as he was making his escape. The Wood County Special Response Team was deployed, and approximately three hours later, appellant was discovered in a pond near Interstate 75, wearing only his underwear. No gun was ever recovered.

### Defendant's Decision About Whether to Testify and Outburst

{¶ 6} After the State rested its case, appellant was asked by the trial court -- outside of the jury's presence, while jurors were in the jury room -- if he wanted to testify. During the subsequent exchange -- involving the trial court, appellant, and defense counsel – appellant stated that he was unprepared to make the decision. The conversation, in relevant part, took place as follows:

> THE COURT: We're back on the record. The Court took a break to allow conversation about whether or not defense would be presenting the case. I'll turn to you, [defense counsel].
>
> [DEFENSE COUNSEL]: Judge, thank you. I think my client is having some – he doesn't want to be here.
>
> THE DEFENDANT: Can I please go back to the jail? Everything I've asked and prepared in preparation for this trial that I asked Mr. Smith to do to advise him of, it hasn't been done. To be ignored, all the above, there's no reason for me to be here. There's no reason. He's done everything that he wanted to do with this trial, how he felt it should go. It never – nothing

of my input, nothing, nothing, nothing has been added from my perspective from my side. So I feel like why am I here?

He could have did this by himself and left me at the jail. We don't even talk. He come in this morning, no good morning, nothing else. I am his client. He should have been to me, hello, how you doing Darryl, okay, this is where we're going to go. I didn't know how it was going to go.

All the evidence presented I have, most of it was the first time I saw it was yesterday. And I think I let the Court know that a long time ago. He should have probably been moving on my case.

The police officers that went up there, I didn't know. That's the first time I knew is when they hit the stand. To be sitting here, to know that I had a black glove on, for the officer to say I had a gun, I was trying --- they said it was a robbery. If I was a threat to them, I would have pointed at them. I would have tried to – I had on a black glove. That officer that came in here today when he said my hand was in the water, he took my hand. He took the glove off my hand and said what the fuck is this. That was not admitted into the evidence with none of my stuff. What the fuck? For the favor of the State it was not no gun.

THE COURT: Mr. Elston, you do have the right to testify. You also have the right not to testify.

THE DEFENDANT: Even reviewing that, we should have been discussing this with my lawyer. Me testifying whether it's a good thing for me, a bad thing for me, what we going to talk about, how we going to go about it, he didn't go over nothing. He came in, he go off of what he felt like it should be, what he feel like. Oh, well, that's just too bad. There's no reason for me. He could have did this trial by his self. I could have been in the jail.

I don't want to be here…. I'm just asking for me to be removed, taken back to the jail, ask him to finish it himself. There's no reason for me to be here at all….

THE COURT: …I'm going to ask you a question. Do you want to testify?

…

THE DEFENDANT: There ain't no reason for me to be here.

THE COURT: Mr. Elston, do you want to testify? Mr. Elston, do you want to testify? I'm asking you a direct question. Do you want to testify? Your nonresponse indicates you do not want to testify.

THE DEFENDANT: I don't know what I should do or what is in the best interest for me. I don't know because I ain't get the best advice or help from my lawyer. I don't know.

THE COURT: At this point you have two options.

THE DEFENDANT: I don't know. I haven't had time to prepare. I haven't had time. Every time you ask me a question it's on the spot. It's on the spot. I had no time to prepare with the exhibits. I don't know.

…

THE DEFENDANT: I don't know. He doesn't listen to me, Your Honor.

THE COURT: Mr. Elston, let's stop right there.

THE DEFENDANT: I don't know.

THE COURT: Let's walk through this.

THE DEFENDANT: We've been walking through this for nine months, Your Honor, nine months….And it's always been in favor for him. All, right. You walk in and, just like yesterday, after I still talking you walked out. Like yesterday when I said, can I talk to you, he said no because I go through my lawyer. You got up there and walked into chambers while I was still talking. So why am I here?

THE COURT: You're here because you are charged with a crime.

THE DEFENDANT: Okay. Well, [defense counsel] is representing me. You all addressing him. Let him go up there on the stand. He knows everything that I'm going to say. Let him go get up there and testify then.

THE COURT: Mr. Elston.

THE DEFENDANT: I don't know.

THE COURT: I understand you don't know. At this time I just want to make sure it's clear for the record.

THE DEFENDANT: I don't know.

THE COURT: Mr. Elston, I'm talking now. So I'll let you talk in a moment. The fact of the matter is that in several pretrials we've gone through several times –

THE DEFENDANT: I want to go back to the jail.

THE COURT: Mr. Elston, I'm speaking now. Do not get up. Okay. At this point the Defendant—

THE DEFENDANT: Take me to the jail. Take me to the jail. Take me to the jail.

{¶ 7} The court asked officers to remove appellant from the courtroom and went off the record. Going back on the record, the trial court stated that appellant had just had a "major outburst." The trial court described the outburst and then asked defense counsel how appellant wished to proceed:

THE COURT: [Appellant] was pounding his head on the table. He stated many times he wanted to be taken back to the jail. I did inquire of him whether he wanted to testify. He made several other comments and never indicated whether he wanted to testify or not.

The Court recognizes he has a right not to testify. The Court had him removed from the courtroom because of his outrageous outburst. We would could not proceed with him here. [Defense Counsel], I'm going to turn to you. I think we should proceed without the Defendant present. I want to ask you about that.

[DEFENSE COUNSEL]: Judge, thank you. I believe in my understanding of the criminal rules I believe once the trial has commenced I believe my client does have the ability not to be present. He made it clear on the record that he wanted to go back to the jail. He didn't want to be present. I think that's his choice. So I don't see any reason to force his appearance at this point….

I think by leaving he's also exercised his Constitutional right to not testify. That is his choice. So I think the Court can proceed without that.

Also, just for the record, Judge, just because I do think it's important, we have not once, not twice, but three times had a conversation of whether or not he would testify today. One of those times involved more than one lawyer in the back room of this courthouse discussing whether or not to testify or not.

We have had these conversations. We have had the opportunity, as the Court is aware, to review the evidence. We have reviewed those body cam footages. We have reviewed those things. So I just want to make that record clear that my client has absolutely had the opportunity to review that information before coming into trial today.

We have had weeks to prepare…. [Appellant] continues to have what appears to be a mental health struggle.

{¶ 8} The State opined that appellant was "deliberately not answering the Court's question about testimony" and was "in effect declining his right to testify and exercising his constitutional right not to testify." The court agreed and concluded that appellant "ha[d] not waived the right to be silent."

**Jury Instructions**

{¶ 9} The jury was returned to the courtroom, and the trial court made the following statement:

First, the Defendant is not present in the courtroom at this time. He has chosen not to be present.

You may not consider or draw any inference or conclusion as to why he is absent for any purpose. You must decide this case solely on the evidence presented.

Further, you may have heard a disruption that occurred in the courtroom while you were in the jury room. Anything you may have heard during this disruption is not evidence. It must not be considered for any purpose. You must decide this case solely on the evidence presented….

8.

**{¶ 10}** Thereafter, the trial court reiterated in its instructions to the jury:

[T]he Defendant has not testified. It is not necessary that the Defendant take the witness stand in his own defense. He has a constitutional right not to testify. The fact that he did not testify must not be considered for any purpose.

## Conclusion of Trial

**{¶ 11}** The matter was submitted to the jury. Following deliberations, the jury found appellant guilty of receiving stolen property, failure to comply, and felony obstruction of justice. The jury found appellant not guilty of having weapons while under disability and tampering with evidence. For the charges of which appellant was convicted, the trial court imposed an aggregate term of 49 months in prison.

## Assignments of Error

**{¶ 12}** On appeal, appellant asserts the following assignments of error:

I. The trial court erred when it removed Mr. Elston from the courtroom without verifying that Mr. Elston had waived his right to testify, and permitted the trial to continue despite the jury hearing a prejudicial outburst, resulting in a plain error that deprived Mr. Elston of his right to present a defense via his testimony in violation of the Ohio and United States Constitutions.

II. Trial counsel was ineffective by failing to ensure adequate communication throughout the process and for permitting the communication to break down to the point that Mr. Elston asked to leave the proceedings, and for failing to move for a mistrial after the jury heard a prejudicial outburst from Mr. Elston.

III. The prosecution presented insufficient evidence, and the convictions were against the manifest weight of the evidence.

**Law and Analysis**

**First Assignment of Error**

{¶ 13} Appellant argues in his first assignment of error that he did not make a knowing and intelligent waiver of his right to testify. He claims that he "[did] not know what to do because he [had] not received sufficient legal advice." Appellant further argues that "when this issue is considered as a whole, including the fact that the jury likely heard at least some of Mr. Elston's outburst, and [the fact] that Mr. Elston would have presented testimony that would have contradicted the testimony regarding the firearm, a plain error occurred," and the trial court should have declared a mistrial or, "at the very least," verified appellant's desire after allowing him to calm down.

{¶ 14} "A criminal defendant has a fundamental right to testify in his or her own defense." *State v. Phillips*, 2025-Ohio-4555, ¶ 22 (10th Dist.), citing *Rock v. Arkansas*, 483 U.S. 44, 49 (1987); *State v. Bey*, 85 Ohio St.3d 487, 499 (1999). The right to testify is "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Rock* at 52, citing *Harris v. New* York, 401 U.S. 222, 230 (1971). A defendant's decision about whether to testify """is an important tactical decision as well as a matter of constitutional right.""" *Phillips* at ¶ 22., citing *Bey* at 499, quoting *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972). "[I]t is a decision that is reserved solely for the defendant." *Id.*, citing *McCoy v. Louisiana*, 584 U.S. 414, 422 (2018), citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Bey* at 499.

{¶ 15} "As with other constitutional rights, a criminal defendant may forfeit or waive the right to testify. A defendant in a criminal case forfeits a constitutional right by

failing to timely assert it before a tribunal having jurisdiction to determine it." *Id.* at ¶ 23, citing *United States v. Olano*, 507 U.S. 725, 731 (1993), citing *Yakus v. United States*, 321 U.S. 414, 444 (1944); *see also State v. Smith,* 2023-Ohio-1533, ¶ 14 (11th Dist.) (exercise of constitutional right to testify is contingent upon a defendant's timely demand); *State v. Brock,* 2009-Ohio-4590, ¶ 14 (6th Dist.) (presuming waiver of the right when the record did not indicate that the defendant asserted his right to testify). "A defendant is not denied the right to testify when there is nothing in the record to support that the defendant 'misunderstood or was unaware of his right to testify' or that he 'wanted to testify and was denied the opportunity to do so.'" *Id.*, citing *Bey* at 499. (Additional citation omitted.) A "'trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense.'" *Id.* (Emphasis in original.)

{¶ 16} In general, "an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *Id.* at ¶ 24, citing *State v. Childs*, 14 Ohio St.2d 56, 61 (1968). (Additional citations omitted.) "Plain error is error that affects an appellant's substantial rights." *State v. Magee*, 2019-Ohio-1921, ¶ 25 (6th Dist.), citing Crim.R. 52(B). "An appellate court 'may recognize plain error, sua sponte, to prevent a miscarriage of justice.'" *Id.*, quoting *State v. Vinson*, 2016-Ohio-7604, ¶ 66 (8th Dist.). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional

11.

circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97.

{¶ 17} Here, there is no question that appellant was informed that he would have the opportunity to testify. Although aware of his right to testify, he refused to exercise it, The trial court repeatedly asked appellant whether he wanted to testify but appellant refused to respond. The trial court informed appellant that it would construe appellant's "nonresponse" as an indication that appellant did not want to testify. While appellant's interaction with the trial court indicated his desire to contradict some of the trial testimony, nothing suggested at that time -- or at any other time during trial -- that he wished to take the stand and testify. The trial court informed appellant of his right to testify and afforded him the opportunity to do so. The trial court was not obligated to do more than that. In refusing to answer the court's direct question as to whether he wanted to exercise his right to testify, appellant forfeited that right. Accordingly we find no error, let alone plain error, in the trial court's determination that in this case appellant elected to exercise his right not to testify in favor of his right to testify.

{¶ 18} We additionally conclude that the trial court's continuation of the trial following appellant's outburst was not unfairly prejudicial to appellant. A trial judge can best determine whether a defendant's right to a fair trial was compromised or whether voir dire of a jury is necessary. *See Bey* at 498. As stated by the Supreme Court of Ohio in *Bey*:

> We have long recognized that for witnesses and spectators, the impact of emotional outbursts…cannot be judged…on a cold record. The same

12.

> principle also applies to outbursts by an accused. Whether the jury was disturbed, alarmed, shocked or deeply moved…depends on the facts which no record can reflect. Absent clear, affirmative evidence to the contrary, the trial court's determination will not be disturbed.

*Id.* (Internal quotations and citations omitted.) In this case -- where the record contains no evidence to suggest that the jury was disturbed, alarmed, shocked or deeply moved by appellant's brief outburst -- the trial court instructed the jury that it could not consider appellant's outburst or absence from the courtroom for any purpose. "A trial jury is presumed to follow the instructions given to it by the judge." *State v. Henderson*, 39 Ohio St.3d 24, 33 (1988), citing *Parker v. Randolph*, 442 U.S. 62 (1979). In addition, as it was appellant himself who created the outburst, "he may not persuasively argue that he is entitled to a mistrial," because "[a] party cannot take advantage of an error he invited or induced." *See Bey* at 500-501. (Additional citation omitted.) For the foregoing reasons, we find no plain error in the trial court's failure to declare a mistrial on the basis of appellant's outburst. Appellant's first assignment of error is found not well-taken.

**Second Assignment of Error**

{¶ 19} Appellant next argues that his trial counsel was ineffective: (1) for "fail[ing] to engage in adequate communication with [him], ultimately resulting in the outburst that precipitated [his] removal from the courtroom at his request;" (2) for "failing to recognize that the right of a criminal defendant to testify has been recognized as a constitutional right;" and (3) for failing to "mitigate the damage" of appellant's outburst "with a private conversation," or by requesting "a recess to allow [appellant] to regain his composure," or by asking for a mistrial.

13.

{¶ 20} To establish a claim of ineffective assistance of counsel, an appellant must show "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984); and *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002). "Failure to present sufficient evidence on either prong is fatal to an ineffective-assistance claim*." State v. Sandifur*, 2024-Ohio-2414, ¶ 31 (6th Dist.), citing *State v. Leasure*, 2023-Ohio-2710, ¶ 40 (6th Dist.), citing *Strickland* at 697.

{¶ 21} In order to prevail on an ineffective-assistance claim, the defendant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland* at 686. "Properly licensed Ohio lawyers are presumed to be competent, and there are "countless" ways for an attorney to provide effective assistance in a case." *Sandifur* at ¶ 32, citing *State v. Gondor*, 2006-Ohio-6679, ¶ 62; *Bradley* at 142. Thus, "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *Bradley* at 142, quoting *Strickland* at 689. "[E]ffective assistance of counsel does not equate with a winning defense strategy ...." *State v. Strickland*, 2003-Ohio-491, ¶ 16 (6th Dist.).

{¶ 22} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the

14.

challenged action 'might be considered sound trial strategy.'" *State v. Smith*, 17 Ohio St.3d 98, 100 (1985), quoting *Strickland* at 694-695. "Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel." *Sandifur* at ¶ 33, citing *State v. Grissom*, 2009-Ohio-2603, ¶ 22 (6th Dist.).

{¶ 23} We begin by addressing appellant's claim that his trial counsel was ineffective for "fail[ing] to engage in adequate communication with [him], ultimately resulting in the outburst that precipitated [his] removal from the courtroom at his request." "A trial attorney's failure to communicate with his or her client may rise to the level of deficient performance, depending on the circumstances." *State v. Lawson*, 2020-Ohio-6852, ¶ 106 (2d Dist.). But "'"a claim of lack of communication between a defendant and his trial counsel is not one that can be borne out by the record [because] [i]t relies upon information necessarily outside the record."'" (Quotation omitted.) *State v. Jones*, 2025-Ohio-2958, ¶ 100, quoting *State v. Allison*, 2024-Ohio-872, ¶ 22 (6th Dist.), quoting *Lawson* at ¶ 106.

{¶ 24} Although the record in this case contains some evidence demonstrating a failure of communication between appellant and his trial counsel – specifically, appellant's complaints concerning his understanding of the case and the way it was being handled -- the record also reveals that appellant and his trial counsel had at least two (court-ordered) conversations during which they reviewed the discovery that had been provided by the State and no less than three conversations during which they discussed whether appellant would testify at trial. Based on the record before us -- which includes

15.

repeated efforts on the part of the trial court to remedy the situation -- we cannot say that appellant's trial counsel's communication with appellant was deficient.

{¶ 25} We further find that appellant has failed to demonstrate a reasonable probability that the outcome of the trial would have been different if there had been better communication with counsel. That is, the record does not demonstrate that but for the alleged communication difficulties between appellant and his trial counsel the results of the proceedings would have been different.

{¶ 26} Next, we address appellant's argument that his trial counsel was ineffective for "failing to recognize that the right of a criminal defendant to testify has been recognized as a constitutional right." The facts do not support this allegation. As indicated above, appellant himself forfeited his right to testify. In light of this forfeiture, trial counsel was not ineffective in interpreting appellant's actions as a decision on the part of appellant to exercise his right to remain silent.

{¶ 27} Furthermore, appellant has failed to demonstrate a reasonable probability that had his counsel framed appellant's actions as forfeiting his right to testify rather than as exercising right to remain silent, the outcome of the proceedings would have been any different.

{¶ 28} Finally, we consider appellant's argument that that his trial counsel was ineffective for failing to "mitigate the damage" of his outburst "with a private conversation," or by requesting "a recess to allow [appellant] to regain his composure," or by asking for a mistrial. As indicated above, appellant may not argue that he is entitled to a mistrial based on an outburst that he created. *See Bey* at 500-501. It follows that

16.

appellant cannot rebut the presumption of sound trial strategy based on a claim that his trial counsel failed to request a mistrial to which appellant was not entitled. *See State v. Henderson*, 2007-Ohio-2372, ¶ 42 (8th Dist.) (Failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial.).

{¶ 29} In addition, appellant has failed to demonstrate a reasonable probability that had his counsel requested a mistrial, a recess to allow appellant to regain his composure, or a private conversation with appellant, the outcome of the proceedings would have been different. *See id.* As indicated above, the jury -- who is presumed to follow jury instructions -- was instructed not to consider appellant's outburst or absence for any purpose. And even if appellant had "regained his composure" and decided to testify, the record shows that the testimony he was prepared to challenge related to the gun charges of which he was ultimately acquitted even without his testimony. Accordingly, appellant's second assignment of error is found not well-taken.

**Third Assignment of Error**

{¶ 30} Appellant argues in his third assignment of error that his conviction for felony obstruction was not supported by sufficient evidence and was against the manifest weight of the evidence, and that his conviction for receiving stolen property was against the manifest weight of the evidence.

{¶ 31} In reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in a light most favorable to the prosecution, and the relevant inquiry is whether

17.

"'any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.'" *State v. Dean*, 2015-Ohio-4347, ¶ 150, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4. "[A]n appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *Jenks* at paragraph two of the syllabus. "A verdict should not be disturbed on appeal unless reasonable minds could not reach the trier of fact's conclusion." *State v. Jordan*, 2023-Ohio-3800, ¶ 16, citing *State v. Montgomery*, 2016-Ohio-5487, ¶ 74. "To reverse a trial court's judgment on the grounds that there was insufficient evidence to support a conviction, 'a concurring majority of a panel of a court of appeals' is necessary." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997).

{¶ 32} By contrast, when an appellate court reviews whether a judgment is against the manifest weight of the evidence, the court looks at the entire record and "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "Sitting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion." *Jordan* at ¶ 17, citing *Thompkins* at 387. "To reverse a trial

18.

court's judgment under a manifest-weight-of-the-evidence challenge, all three judges on the court-of-appeals panel must concur." *Id.*, citing Ohio Constitution, Article IV, Section 3(B)(3).

### a. Felony obstruction.

{¶ 33} R.C. 2921.31, which governs the offense of obstructing official business, provides in relevant part:

> (A)   No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

> (B)   Whoever violates this section is guilty of obstructing official business. Except as otherwise provided in this division, obstructing official business is a misdemeanor of the second degree. If a violation of this section creates a risk of physical harm to any person, obstructing official business is a felony of the fifth degree.

{¶ 34} Appellant specifically attacks the felony aspect of the obstructing charge, which requires the creation of a "risk of physical harm"– in this case, a risk of physical harm to pursuing officer, Officer Nagy.  Attempting to limit the argument to the facts that occurred during the vehicle pursuit, appellant suggests the danger created by the vehicle chase was already made part of the failure to comply charge and therefore could not support both the failure to comply and obstructing official business charges without giving rise to merger issues.

{¶ 35} Ohio courts have made clear that "'[t]he potential risk of injury to an officer in pursuit of a suspect need not be a large one in order to support a conviction for

19.

obstruction of official business.'" *State v. Sorrell,* 2023-Ohio-2101, ¶ 45 (3d Dist.), quoting *State v. Woodson,* 2008-Ohio-1469, ¶ 27 (9th Dist.); *see also State v. Petteway,* 2017-Ohio-716, ¶ 23 (7th Dist.). Here, the evidence established that appellant led officers, including Officer Nagy, on a foot chase during which appellant went down an embankment in the area of bridge construction that was immediately adjacent to Interstate 75. Appellant then crossed Interstate 75, dodging multiple lanes of interstate traffic. Although there is nothing in the record to suggest that Officer Nagy actually pursued appellant down the embankment and across the highway, the situation created by appellant in leading officers towards this highly dangerous situation was sufficient to establish a risk of physical harm to the pursuing officers, including pursuing Officer Nagy. The jury, in finding appellant guilty of felony obstructing official business, did not lose its way.

{¶ 36} Next, we turn our attention to appellant's conviction for receiving stolen property, and appellant's claim that it was not supported by the manifest weight of the evidence. R.C. 2913.51 sets forth the offense of receiving stolen property as follows:

> (A)  No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense.

Appellant, in making his argument that his conviction was against the manifest weight of the evidence places emphasis on when he knew the vehicle was *reported* stolen. But the statute prohibits retaining property that the offender knew to be stolen, not property that the offender knew to be reported stolen. The testimony of S.W. made clear that appellant did not have permission to take or to retain S.W.'s vehicle. That S.W. attempted to

20.

convince appellant to return his vehicle before reporting it stolen does nothing to alter or diminish these facts. In convicting appellant of receiving stolen property, the jury did not lose its way. Appellant's third assignment of error is therefore found not well-taken.

## Conclusion

{¶ 37} The judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| Gene A. Zmuda, J | |
| --- | --- |
| | JUDGE |
| Myron C. Duhart, J | |
| | JUDGE |
| Charles E. Sulek, J | |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

**SULEK, J., Concurring.**

{¶ 38} I concur with the majority's decision affirming defendant Darryl Elston's convictions. I write separately simply to highlight that an exception exists to the general

rule that "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis sic.) *State v. Bey*, 85 Ohio St.3d 487, 499 (1999); *State v. Phillips*, 2025-Ohio-4555, ¶ 23 (10th Dist.). Several federal appellate courts have recognized that "'in exceptional, narrowly defined circumstances'" the Fifth Amendment imposes a duty on trial courts to inquire sua sponte whether a defendant knowingly, voluntarily, and intelligently waives his or her right to testify. *U.S. v. Rodriguez-Aparicio*, 888 F.3d 189, 194 (5th Cir.2018), quoting *U.S. v. Pennycooke*, 65 F.3d 9, 12 (3d Cir.1995). "Virtually all of these circumstances involve conflicts between the defendant and counsel." *Id.*, citing *U.S. v. Stark*, 507 F.3d 512, 516-517 (7th Cir.2007); *U.S. v. Webber*, 208 F.3d 545, 552 (6th Cir.2000); *Pennycooke*, 65 F.3d at 12; *U.S. v. Janoe*, 720 F.2d 1156, 1161 (10th Cir.1983).

{¶ 39} Here, it is unclear whether a potential or actual conflict existed between Elston and his counsel regarding Elston's right to testify. Regardless, even assuming that the trial court had a duty in this case to inquire whether Elston was knowingly, voluntarily, and intelligently waiving his right to testify, it fulfilled its obligation to do so. The trial court made Elston aware of his right to testify and asked multiple times whether he wished to exercise that right. Elston, however, refused to answer the court before needing to be removed from the proceeding. I therefore concur with the majority that Elston's first assignment of error is not well-taken.

{¶ 40} I join the remainder of the majority opinion in its entirety.

22.